**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND**<br>**ETHICS IN WASHINGTON**<br>455 Massachusetts Ave., N.W. Sixth Floor<br>Washington, D.C. 20001,<br><br>**MELANIE SLOAN**<br>1229 Independence Ave, S.E.<br>Washington, D.C. 20003<br><br>       Plaintiffs,<br><br>   v.<br><br>**FEDERAL ELECTION COMISSION**<br>999 E Street, N.W.<br>Washington, D.C. 20463,<br><br>       Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.     This is an action for injunctive and declaratory relief under the Federal Election

Campaign Act of 1971 ("FECA"), 52 U.S.C. § 30109(a)(8)(C), challenging as arbitrary,

capricious, an abuse of discretion, and contrary to law (1) the dismissal by the Federal Election

Commission ("FEC" or "Commission") of an administrative complaint by Citizens for

Responsibility and Ethics in Washington ("CREW") and Melanie Sloan (together with CREW,

"Plaintiffs") against the American Action Network ("AAN") after remand to the agency to

correct legal errors identified by Judge Christopher Cooper, *CREW v. FEC*, No. 1:14-cv-01419

(CRC), 2016 U.S. Dist. LEXIS 127308 (D.D.C. Sept. 19, 2016); and (2) the FEC's constructive

dismissal of or failure to act on an administrative complaint by Plaintiffs against Americans for

Job Security ("AJS") after remand by the same order of Judge Cooper.

2.      As alleged below, on September 19, 2016, Judge Cooper held the FEC's previous dismissals of Plaintiffs' complaints against AAN and AJS were "contrary to law" in violation of the FECA.  CREW, 2016 U.S. Dist. LEXIS 127308, at *43.  In particular, Judge Cooper found the dismissals were contrary to law because the three commissioners who voted against finding reason to believe AAN and AJS violated the FECA (the "controlling commissioners") impermissibly treated all of the groups' non-express advocacy communications, including their electioneering communications, as non-electoral in determining their major purpose.  *Id.* at *37–38.  Further, Judge Cooper found the controlling commissioners' giving equal weight to activity from the distant past and to the groups' recent activity in order to determine their current major purpose was arbitrary and capricious.  *Id.* at *43.  Judge Cooper reversed the FEC's prior dismissals of Plaintiffs' complaints against AAN and AJS, and ordered the FEC to act in conformance with the Court's order within thirty days.  *Id.*

3.      Nevertheless, on remand, the controlling commissioners failed to act in conformity with Judge Cooper's decision.

4.      With regard to AAN, they once again refused to find reason to believe AAN violated the FECA by failing to register as a political committee, which deadlocked the commission and resulted in the FEC once again dismissing Plaintiffs' complaint against the group.  In direct contravention of Judge Cooper's decision that, at a minimum, "*many* or even *most*" electioneering communications were designed to influence elections, the controlling commissioners concluded that only four of AAN's twenty types of electioneering communications could be treated as election-related.  In making this determination, the controlling commissioners relied on impermissible interpretations of law and arbitrary and capricious analyses and, thus, the dismissal was contrary to law.

5.     With regard to AJS, the FEC entirely failed to act on remand.  Despite Judge

Cooper's thirty-day deadline to act passing on October 19, 2016, the FEC has revealed no further

action on Plaintiffs' complaint against AJS.  The FEC's failure to act is contrary to law and,

moreover, any decision by the FEC failing to find reason to believe AJS violated the FECA

would be contrary to law.

6.     Plaintiffs bring the instant action to correct the controlling commissioners'

continued failure to abide by the FECA and to obtain the disclosure the FECA requires of AAN

and AJS.

## JURISDICTION AND VENUE

7.     This Court has both subject matter jurisdiction over this action and personal

jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A).  This Court also has

jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 28 U.S.C. §§ 2201(a) and 2202.

Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## PARTIES

8.     Plaintiff CREW is a non-profit, non-partisan corporation organized under section

501(c)(3) of the Internal Revenue Code.

9.     CREW is committed to protecting the rights of citizens to be informed about the

activities of government officials, ensuring the integrity of government officials, protecting our

political system against corruption, and reducing the influence of money in politics.  CREW

works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency.

Further, CREW seeks to ensure campaign finance laws are properly interpreted, enforced, and

implemented.

10.     To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions, and the outside influences that have been brought to bear on those actions.  A core part of this work is examining and exposing the special interests that have influenced our elections and elected officials and using that information to educate voters regarding the integrity of public officials, candidates for public office, the electoral process, and our system of government.

11.     Toward this end, CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election.  CREW regularly reviews campaign finance reports that groups, candidates, and political parties file with the FEC disclosing their expenditures and, in some cases, their contributors.  Using the information in those reports CREW, through its website, press releases, reports, and other methods of distribution, publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

12.     CREW also files complaints with the FEC when it discovers violations of the FECA.  Publicizing violations of the FECA and filing complaints with the FEC serve CREW's mission of keeping the public, and voters in particular, informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance laws.

13.     CREW is hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden.  Likewise, the FEC's refusal to properly administer the campaign finance laws, particularly the FECA's reporting requirements, hinders CREW in its programmatic activity, as compliance with those reporting requirements often provides CREW with the only

source of information about those individuals and groups funding the political process.  As a result of the FEC's refusal to enforce the FECA's disclosure provisions, organizations like AAN and AJS have been able to pour vast amounts of "dark" or anonymous money into the political system without revealing the source of that money.  This deprives CREW of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

14.     A part of CREW's work in carrying out its central mission focuses on so-called "pay-to-play" schemes.  Toward that end, CREW looks for correlations between donations to the campaign of a member of Congress or candidate and that member's subsequent congressional activities, including pushing issues and legislation that serve the interests of the member's donors.  Information that an individual or entity made a large dollar contribution may be very revealing about the influences that donor has brought to bear on the member post-election. Without information about the individuals and entities funding the political activities of organizations like AAN and AJS, CREW is stymied in fulfilling its central mission.

15.     As an example, in May 2013, CREW issued a report, *Rise of the Machines*, detailing the growing political influence of high frequency traders in Washington.  CREW's analysis was based in large part on the lobbying and campaign contribution records of 48 companies specializing in high frequency trading.  That data revealed that between the 2008 and 2012 election cycles, the campaign contributions of these firms increased by 673 percent, from $2.1 million during the 2008 election cycle to $16.1 million during the 2012 cycle.  CREW was able to obtain this information because of the disclosure requirements to which the organizations receiving those contributions—federal candidates, party committees, PACs, and super PACs— are subject under the FECA.

16.     As another example, CREW published *Stealth Donors*, a December 2012 report on donors who gave more than $1,000,000 to super PACs trying to influence the 2012 election.  The report revealed a dozen donors with policy or business interests that depended on the outcome of the elections, but whose efforts to sway voters largely were out of the public view.  CREW obtained the information used in this report from information the FECA requires political committees to disclose.

17.     CREW continually posts new materials describing the results of its research on its website, www.citizensforethics.org/.  For example, when CREW learns the identity of a contributor to a dark money group like AAN or AJS, CREW publicizes that information.  *See, e.g.*, Carrie Levine, HCSC Lobbyist Unmasked as American Action Network Donor, CREW (Oct. 7, 2014), *available at* http://www.citizensforethics.org/hcsc-lobbyist-unmasked-as-american-action-network-donor/ (publicizing identity of single AAN contributor accidentally revealed during a deposition).

18.     For organizations like AAN and AJS that refuse to identify themselves as political committees and comply with the FECA's disclosure requirements, CREW has no access to information comprehensively detailing the sources of the money they are using for political purposes. CREW would share the information it received about AAN's and AJS's contributors with voters nationwide, but is unable to do so because AAN and AJS have not made that information available.  As a result, CREW is harmed when the FEC fails to properly administer the FECA, particularly the statute's reporting requirements, thereby limiting CREW's ability to obtain and review campaign finance information.

19.     At the time CREW filed its administrative complaints against AAN and AJS, plaintiff Melanie Sloan was the executive director of CREW.  She is a citizen of the United

States and a registered voter and resident of the District of Columbia.  As a registered voter, Ms. Sloan is entitled to receive all the information the FECA requires political committees to report publicly and to the FEC's proper administration of the provisions of the FECA.  Ms. Sloan is harmed in exercising her right to an informed vote when a person fails to disclose his or her spending on independent expenditures and electioneering communications and when a political committee fails to disclose the source of its funds used for political activities, as the FECA requires.

20.     Ms. Sloan also is personally committed to ensuring the integrity of federal elections.  Toward that end, Ms. Sloan reviews campaign finance filings and media reports to determine whether candidates and political committees are complying with the FECA's requirements.  As with CREW, Ms. Sloan would share the information she received with other voters.

21.     When CREW and Ms. Sloan file complaints against violators of the FECA, they rely on the FEC, as the exclusive civil enforcement authority, to comply strictly with the FECA when making its enforcement decisions.  *See* 52 U.S.C. § 30107(e).  CREW and Ms. Sloan are harmed and are "aggrieved" parties when the FEC dismisses their complaints contrary to the FECA, refuses to enforce the FECA's mandatory disclosure requirements, or otherwise acts contrary to the requirements of the FECA.  *See* 52 U.S.C. § 30109(a)(8)(C).

22.     Defendant FEC is the federal agency established by Congress to oversee the administration and civil enforcement of the FECA.  *See* 52 U.S.C. §§ 30106, 30106(b)(1).

## STATUTORY AND REGULATORY FRAMEWORK

### *Political Committees*

23.     The FECA and the implementing FEC regulations impose on "political committees" registration, organization, and disclosure requirements.

24.     The FECA and implementing FEC regulations define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year."  52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a).

25.     The FECA defines an "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(9)(A).  The Supreme Court has clarified that an "expenditure" for the purpose of this definition includes only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *See Buckley v. Valeo*, 424 U.S. 1, 80 (1976).

26.     In *Buckley*, the Court carved out from the reach of the FECA's political committee provisions groups that, while they met the statutory definition, were neither under the control of a candidate nor had the requisite "major purpose" to nominate or elect of federal candidates.  *See* 424 U.S. at 79.

27.     An organization's major purpose may be demonstrated by its activities, and a group that devotes a sufficiently extensive amount of its spending to campaign activity may be subjected to the FECA's political committee provisions.  *See FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986).

28.     Neither the Court, nor the FECA or FEC regulations define the scope of qualifying campaign activity.  The FECA and FEC regulations nonetheless regulate two forms of communications as election-related:  express advocacy communications and electioneering communications.  52 U.S.C. §§ 30101(17), 30104(f); 11 C.F.R §§ 100.16, 100.29(a).  An express advocacy communication is any communication that expressly asks the audience to "vote for" or "vote against" a candidate, or uses similar terms such that "[r]easonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action."  11 C.F.R. § 100.22.  An electioneering communication is any broadcast communication that "refers to a clearly identified candidate for Federal office," is publicly distributed within "60 days before a general, special, or runoff election for the office sought by the candidate, or . . . 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate, . . . is targeted to the relevant electorate," and does not fall within one of the statutory exceptions.  52 U.S.C. § 30104(f)(3)(A), (B); 11 C.F.R. § 100.29(a).  The FECA imposes various disclosure burdens on anyone who spends a sufficient amount of money on either form of communication.  52 U.S.C. §§ 30104(c)(1), (f)(1); 11 C.F.R. §§ 104.20(b), 109.10.

29.     The FECA and FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee.  52 U.S.C. § 30103(a); 11 C.F.R. § 102.1.

30.     Further, under the FECA and implementing FEC regulations, political committees must file periodic reports with the FEC that, among other things: (1) identify all individuals contributing an aggregate of more than $200 in a year to the organization, and the amount each individual contributed; (2) identify all political committees making a contribution to the

organization, and the amount each committee contributed; (3) detail all of the organization's outstanding debts and obligations; and (4) list all of the organization's expenditures, including its independent expenditures and electioneering communications.  52 U.S.C. § 30104(a)(4), (b), (f)(2); 11 C.F.R. §§ 104.3, 104.4, 104.20(b).

### *Enforcement*

31.     Under the FECA, any person who believes there has been a violation of the FECA may file a sworn complaint with the FEC.  52 U.S.C. § 30109(a)(1).  Based on the complaint, the response from the person alleged to have violated the Act, and any recommendation of the FEC's Office of General Counsel ("OGC"), the FEC may then vote on whether there is "reason to believe" a violation of the FECA has occurred.  52 U.S.C. § 30109(a)(2).  If the FEC finds there is "reason to believe" a violation of the FECA has occurred, the FEC must notify the respondents of that finding and must "make an investigation of such alleged violation."  *Id.*

32.     After the investigation, the OGC may recommend the FEC vote on whether there is "probable cause" to believe the FECA has been violated.  52 U.S.C. § 30109(a)(3).  The OGC must notify the respondents of any such recommendation and provide them with a brief stating the position of the OGC on the legal and factual issues presented, to which the respondents may reply.  *Id.*

33.     Upon consideration of these briefs, the FEC may then determine whether there is "probable cause" to believe a violation of the FECA has occurred.  52 U.S.C. § 30109(a)(4)(A)(i).  If the FEC finds probable cause to believe a violation of the FECA has occurred, the FEC must attempt for at least 30 days, but not more than 90 days, to resolve the matter "by informal methods of conference, conciliation and persuasion," *id.*, a process that does not involve the complainant.

34.     If the FEC is unable to settle the matter through informal methods, it may institute a civil action for legal and equitable relief in the appropriate United States district court.  52 U.S.C. § 30109(a)(6)(A).  In any action instituted by the FEC, a district court may grant injunctive relief as well as impose monetary penalties.  52 U.S.C. § 30109(a)(6)(B)–(C).

35.     If at any stage of the proceedings the FEC dismisses a complaint, any "party aggrieved" may seek judicial review of that dismissal in the United States District Court for the District of Columbia.  52 U.S.C. § 30109(a)(8)(A).  All petitions from the dismissal of a complaint by the FEC must be filed "within 60 days after the date of the dismissal."  52 U.S.C. § 30109(a)(8)(B).

36.     The district court reviewing the FEC's dismissal of a complaint may declare the FEC's actions "contrary to law."  52 U.S.C. § 30109(a)(8)(C).  The court also may order the FEC "to conform with such declaration within 30 days."  *Id.*  If the FEC fails to abide by the court's order, the FECA provides the complainant with a private right of action, brought in the complainants' own name, "to remedy the violation involved in the original complaint."  *Id.*

## FACTUAL BACKGROUND

### *American Action Network*

37.     The Washington, D.C.-based American Action Network ("AAN"), formed in July 2009, is a tax-exempt organization under section 501(c)(4) of the Internal Revenue Code.

38.     AAN describes its mission as creating, encouraging, and promoting center-right policies based on the principles of freedom, limited government, American exceptionalism, and strong national security, and states as its "primary goal" "to put our center-right ideas into action by engaging the hearts and minds of the American people and spurring them into active participation in our democracy."

39.     Between July 23, 2009, and June 30, 2011, according to reports AAN filed with the FEC, AAN spent $4,096,910 on independent expenditures and $14,038,625 on electioneering communications, a total of $18,135,535.  Broken down by AAN's fiscal year, AAN reported spending $4,036,987 on independent expenditures and $14,038,625 on electioneering communications between July 1, 2010 and June 30, 2011, a total of $18,075,612.  AAN further reported spending $59,922 on independent expenditures between July 23, 2009 and June 30, 2010.  The money was spent largely producing and broadcasting television and Internet advertisements in 29 primary and general elections.

40.     AAN spent significant funds on twenty versions of electioneering communications in twenty different federal races.  For example, starting on October 22, 2010, just weeks before the election, AAN spent $725,000 broadcasting an advertisement against Rep. Ed Perlmutter (D-CO) that expressed disbelief that "convicted rapists can get Viagra paid for by the new health care bill."  Noting Rep. Perlmutter had voted for the Affordable Care Act (which did not, in fact, pay for convicted rapists to obtain Viagra), the advertisement encouraged viewers to "tell Congressman Perlmutter vote for repeal in November" and to "[v]ote Yes on H.R. 4903."  The House went into recess at the end of September 2010, with no votes scheduled on H.R. 4903 or any other bill repealing the health care law during November 2010 or, indeed, the remainder of the 111th Congress.  Accordingly, AAN's reference to a vote "in November" could have referred only to the upcoming congressional election in which viewers of the advertisement could vote.

41.     All of the electioneering communications AAN broadcast in 2010 similarly were related to the election.

42.     The proper time period for comparing AAN's political activity to its overall spending is the 2010 calendar year.  However, because AAN's fiscal year runs from July 1

through June 30, and it reported its overall spending to the Internal Revenue Service ("IRS") on

its tax returns using those time periods, Plaintiffs do not have sufficient information to precisely

determine AAN's overall spending for 2010.

43.     The closest time period for which there is reported information about AAN's

spending is its 2010 fiscal year, covering July 1, 2010 through June 30, 2011.  On its 2010 tax

return, AAN reported spending a total of $25,692,334 on all activities during that period.  As

discussed above, AAN reported to the FEC spending $18,075,612 on independent expenditures

and electioneering communications during the 2010 fiscal year.  As a result, AAN's political

spending comprised approximately 70.4 percent of its total spending in that fiscal year.

44.     AAN may have spent even more money on politics.  On its 2010 tax return, AAN

reported spending a total of $5,035,953 on political expenditures.  That is approximately

$998,966 more than the amount it reported to the FEC spending on independent expenditures

that year.  AAN maintained in previous proceedings that none of the money it spent on

electioneering communications qualified as political activity.  Accordingly, AAN may have

spent an additional $998,966 on political activities which it has not explained.  If this sum is

added to the $18,075,612 AAN reported spending on independent expenditures and

electioneering communications, AAN's total political spending for fiscal year 2010 would be

$19,074,577, or 74.2 percent of its total spending.

45.     Looking instead at AAN's first two years of existence, AAN still spent most of its

money on election-related activities.  On its 2009 tax return, AAN reported spending a total of

$1,446,675 on all activities for the period July 23, 2009 through June 30, 2010, its 2009 fiscal

year, making AAN's total reported spending for its 2009 and 2010 fiscal years combined

$27,139,009.  The $18,135,535 in independent expenditures and electioneering communications

AAN reported to the FEC, therefore, comprises 66.8 percent of its total spending between July 23, 2009 and June 30, 2011.

46.     As with its 2010 tax return, AAN's 2009 tax return reported more political expenditures than AAN reported to the FEC.  AAN's 2009 tax return identified $185,108 in political expenses, about $125,186 more than AAN reported in independent expenditures during the same period.  Including all of AAN's unexplained spending for fiscal years 2009 and 2010 brings its total spending on political activity to $19,199,763.  Based on this figure, AAN's political spending comprised 70.7 percent of its overall spending between July 23, 2009 and June 30, 2011.

47.     On June 7, 2012, plaintiffs CREW and Melanie Sloan filed a complaint with the FEC against AAN for violating the FECA ("MUR 6589").  The complaint alleged, as demonstrated by its extensive spending on federal campaign activities, AAN's major purpose was the nomination or election of federal candidates.

48.     On January 17, 2013, the OGC issued the First General Counsel's Report ("AAN Report") recommending the Commission find reason to believe AAN had as its major purpose the nomination or election of federal candidates during 2010, and therefore violated 52 U.S.C. §§ 30102, 30103, and 30104 by failing to organize, register, and report as a political committee. In particular, the OGC found AAN spent at least $4,096,910 on independent expenditures between July 2009 and June 2011, of which approximately $4,044,572 was spent in 2010.  The OGC further found AAN spent at least $12,968,445 on electioneering communications during 2010.  The OGC could not determine the total amount AAN spent in 2010 alone, so it assumed all of AAN's reported spending occurred in 2010—the assumption most beneficial to AAN.  The OGC then concluded AAN spent at least $17,013,017 on federal campaign activity during 2010,

or at least 62.6 percent of its total spending for that calendar year on federal campaign activity. As a result, the OGC concluded, AAN's spending showed the group's major purpose during 2010 was federal campaign activity.

49.     Despite the detailed analysis of the AAN Report, on June 24, 2014, the Commission by a vote of three to three failed to find reason to believe AAN had violated 52 U.S.C. §§ 30102, 30103, or 30104, and by a vote of six to zero closed the file.

50.     On July 30, 2014, the FEC released the statement of reasons of the three commissioners voting against finding "reason to believe"—then Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Petersen ("Goodman, Hunter, Petersen AAN SoR").  These commissioners, "[a]s the controlling decision makers," concluded AAN's major purpose, based on its public statements, organizational documents, and overall spending history, "has been issue advocacy and grassroots lobbying and organizing."

51.     To reach that conclusion, the Goodman, Hunter, Petersen AAN SoR interpreted the First Amendment and judicial precedent to require the FEC to ignore AAN's communications that did not contain express advocacy, and to treat all such non-express advocacy communications, including AAN's electioneering communications, as not indicative of a purpose to nominate or elect candidates.   Further, the Goodman, Hunter, Petersen ANN SoR interpreted the *Buckley*'s "major purpose" limitation as considering the group's activities over its entire life and treating all such activity as equally important to determine whether the group's current major purpose was to nominate or elect candidates.

52.     On August 20, 2014, Plaintiffs brought suit against the FEC challenging the dismissal of Plaintiffs' administrative complaint against AAN as "contrary to law" in violation of 52 U.S.C. § 30109(a)(8).

53.     On September 19, 2016, Judge Christopher Cooper granted Plaintiffs' motion for summary judgment, finding that the FEC's dismissal of Plaintiffs' complaint against AAN was "contrary to law." *CREW*, 2016 U.S. Dist. LEXIS 127308.  In relevant part, Judge Cooper ruled that the Goodman, Hunter, Petersen AAN SoR committed legal error by concluding that the "First Amendment effectively required the agency to exclude from its consideration all non-express advocacy in the context of disclosure," including the FECA's political committee provisions.  *Id.* at *37–38.  The Court found that it "blinks reality to conclude that many of the ads considered by the Commissioners in this case were not designed to influence the election or defeat of a particular candidate in an ongoing race." *Id.* at *37.  Rather, the Court noted that the record supported the conclusion that, at a minimum, "*many* or even *most* electioneering communications indicate a campaign related purpose." *Id.*  Accordingly, the Court reversed the dismissal and remanded for reconsideration within thirty days, to be made in conformity with the Court's declaration.  *Id.* at *43–44.

54.     On October 19, 2016, the FEC notified Plaintiffs that the Commission had once again deadlocked on the question of whether AAN had violated 52 U.S.C. §§ 30102, 30103, 30104, and therefore the Commission had voted to once again close its file on AAN. Accompanying the notice was a new statement of reasons by Chairman Matthew S. Petersen and Commissioners Caroline C. Hunter and Lee E. Goodman ("Petersen, Hunter, Goodman AAN Remand SoR")—the same commissioners who had voted against finding reason to believe AAN violated the FECA in the first instance—explaining their continued refusal to find reason to believe AAN had violated the FECA by failing to register as a political committee.  *See* Ex. 1.

55.     In the Petersen, Hunter, Goodman AAN Remand SoR, the commissioners no longer excluded all electioneering communications, but rather conducted an "[a]d-by-[a]d

[a]nalysis" of each of AAN's electioneering communications in 2010 to determine whether the

ad demonstrated an electoral purpose.  To guide that analysis, the Petersen, Hunter, Goodman

AAN Remand SoR laid out the following framework to analyze an ad's electoral purpose:

> In evaluating major purpose, our starting point is the language of
> the communication itself.  In other words, we look at the ad's
> specific language for references to candidacies, elections, voting,
> political parties, or other indicia that the costs of the ad should be
> counted towards a determination that the organization's major
> purpose is to nominate or elect candidates.  We also examine the
> extent to which the ad focuses on issues important to the group or
> merely on the candidates referenced in the ad.  Additionally, we
> consider information beyond the content of the ad only to the
> extent necessary to provide context to understand better the
> message being conveyed.  Finally, we ascertain whether the
> communication contains a call to action and, if so, whether the call
> relates to the speaker's issue agenda or, rather, to the election or
> defeat of federal candidates.

56.     Applying that test, the Petersen, Hunter, Goodman AAN Remand SoR found only

four of AAN's twenty types of electioneering communications "may reasonably support an

inference that their cost may count toward a determination that AAN's major purpose was the

nomination or election of federal candidates."  In particular, they found that any ad that "focuses

on government [policies] and calls on viewers to contact the named officeholders to urge them to

take specific legislative actions" could not evidence an electoral purpose.  Adding only AAN's

spending on these four ads to its spending on express advocacy, the Petersen, Hunter, Goodman

AAN Remand SoR determined AAN had spent at most only 22% of its budget on election-

related activities, and found that amount to be insufficient to conclude AAN had the major

purpose of nominating or electing candidates.

### *Americans for Job Security*

57.     The Alexandria, Virginia-based organization Americans for Job Security ("AJS"),

formed in 1997, is a tax-exempt organization organized under section 501(c)(6) of the Internal

Revenue Code.  Its president and treasurer is Stephen DeMaura.

58.     AJS describes itself as an "independent, bi-partisan, pro-business issue advocacy

organization," with the chief goal of "educating the public on issues of importance to business,

and encouraging a strong job-creating economy that promotes a pro-growth agenda."  According

to its articles of incorporation, AJS was incorporated for the purpose of uniting "in a common

organization businesses, business leaders, entrepreneurs, and associations of businesses" and to

"promote the common business interest of its members . . . by helping the American public to

better understand public policy issues of interest to business."

59.     Between January 15 and October 31, 2010, according to reports AJS filed with the

FEC, AJS spent $8,971,043 on independent expenditures and electioneering communications,

largely on broadcasting television and Internet advertisements in 20 primary and general

elections.

60.     AJS reported to the FEC spending $4,414,524 on independent expenditures and

$4,556,519 on electioneering communications through October 31, 2010, and $4,908,846 on

independent expenditures for calendar year 2010.  AJS made no additional electioneering

communications in 2010 after October 31, 2010.

61.     AJS spent significant sums on about ten versions of electioneering

communications covering seven different federal races.  For example, AJS spent $479,268 on

January 15, 2010, producing and broadcasting an advertisement promoting Scott Brown, then a

state senator and the Republican candidate in the January 19, 2010 special election for a U.S.

Senate seat in Massachusetts.  AJS's advertisement first told viewers that "behind closed doors,

Washington decides the future of our health care, with no transparency or accountability.  They

are slashing Medicare and raising taxes, and only listening to the special interests."  AJS then

said that "one Massachusetts leader says slow down, get health care right.  Scott Brown says

protect Medicare, don't raise taxes, listen to the people, not the lobbyists."  AJS's advertisement

concluded by encouraging voters to "call Scott Brown and tell him you agree Washington should

listen to us on health care for a change."

62.     From November 1, 2009 through October 31, 2010—AJS's fiscal year—AJS

reported to the IRS spending a total of $12,417,809 on expenditures.  AJS reported spending

only $4,351,478 on political expenditures, less than what AJS reported to the FEC it spent on its

independent expenditures alone.  Plaintiffs do not possess knowledge sufficient to determine

how much of that reported amount to allocate to AJS's political expenses in 2010.  Combined,

AJS's spending on independent expenditures and electioneering communications for its fiscal

year comprised 72.2 percent of its total spending.

63.     On March 8, 2012, plaintiffs CREW and Melanie Sloan filed a complaint with the

FEC against AJS for violating the FECA ("MUR 6538").  The complaint alleged that, as

demonstrated by its extensive spending on federal campaign activities, AJS's major purpose in

2010 was the nomination or election of federal candidates.  As a result, AJS violated the FECA,

52 U.S.C. §§ 30103, 30104, and the relevant implementing FEC regulations.

64.     On May 2, 2013, the OGC issued the First General Counsel's Report ("AJS

Report") recommending that the Commission find reason to believe that, because AJS had as its

major purpose federal campaign activity during 2010, AJS violated 52 U.S.C. § 30102, 30103,

and 30104 by failing to organize, register, and report as a political committee.  The OGC found

AJS spent approximately $4,908,847 in independent expenditures and $4,598,518 on electioneering communications in the 2010 calendar year. The OGC looked to AJS's activities in the 2010 calendar year, rather than the AJS's "entire history" spanning more than a decade, explaining a calendar year test "provides the firmest statutory footing for the Commission's major purpose determination—and is consistent with the FECA's plain language." The OGC concluded at least 76.5 percent of AJS's total spending for the 2010 calendar year went to federal campaign activity. As a result, the OGC concluded, AJS's spending showed the group's major purpose during 2010 was federal campaign activity.

65.     Despite the detailed analysis of the AJS Report, on June 24, 2014, the Commission by a vote of three to three failed to find reason to believe AJS had violated 52 U.S.C. §§ 30102, 30103, and 30104, and by a vote of six to zero closed the file.

66.     On July 30, 2014, the FEC released the statement of reasons of the three commissioners voting against finding "reason to believe"—then Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Petersen ("Goodman, Hunter, Petersen AJS SoR"). These commissioners, "[a]s the controlling decision makers," concluded AJS's major purpose, as "an organization that has spent less than ten percent of its funds on express advocacy during its entire existence . . . [was an] issue-advocacy organization [and] cannot be regulated as a political committee."

67.     To reach that conclusion, the Goodman, Hunter, Petersen AJS SoR interpreted the First Amendment and judicial precedent to require the FEC to ignore AJS's communications that did not contain express advocacy, and to treat all such non-express advocacy communications, including AJS's electioneering communications, as not indicative of a purpose to nominate or elect candidates. The Goodman, Hunter, Petersen AJS SoR further interpreted the *Buckley*'s

"major purpose" limitation as considering the group's activities over its entire life and treating all such activity as equally important to determine whether the group's current major purpose was to nominate or elect candidates.

68.      On August 20, 2014, Plaintiffs filed suit against the FEC alleging the FEC's dismissal of Plaintiffs' administrative complaint against AJS was "contrary to law," in violation of 52 U.S.C. § 30109(a)(8)(C).

69.      On September 19, 2016, in the same order in which Judge Cooper found the FEC's dismissal of Plaintiffs' complaint against AAN was contrary to law, Judge Cooper also found the FEC's dismissal of Plaintiffs' complaint against AJS was contrary to law and granted Plaintiffs' motion for summary judgment.  *CREW*, 2016 U.S. Dist. LEXIS 127308.  In particular, as with AAN, Judge Cooper ruled that the Goodman, Hunter, Petersen AJS SoR committed legal error by concluding that the "First Amendment effectively required the agency to exclude from its consideration all non-express advocacy in the context of disclosure."  *Id.* at *37–38.

70.      Judge Cooper further found that the Goodman, Hunter, Petersen AJS SoR's "refusal to give any weight whatsoever to an organization's relative spending in the most recent calendar year—particularly in the case of a fifteen-year-old organization like AJS—indicates an arbitrary 'fail[ure] to consider an important aspect of the [relevant] problem.'"  *Id.* at 40 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)).  Accordingly, Judge Cooper reversed the dismissal of Plaintiffs' complaint against AJS and remanded for reconsideration within thirty days, to be made in conformity with the Court's declaration.  *Id.* at *43–44.

71.      The Court's thirty-day deadline expired on October 19, 2016.

72.     Despite the expiration of the deadline, the FEC has neither informed Plaintiffs nor the Court of any action it has taken on the AJS matter beyond the Commissioners deadlocking on the question of whether to appeal Judge Cooper's decision.  On information and belief, the AJS matter remains open before the FEC and the Commission has failed to act in conformity with Judge Cooper's September 19 Order within the proscribed time period.

### PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
### The FEC's Dismissal of the AAN Matter on Remand Is
### Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law

73.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

74.     The FEC's dismissal on remand of the Plaintiffs' administrative complaint against AAN was arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C) because it was not in conformity with Judge Cooper's September 19 Order and continued to rest on impermissible interpretations of law and arbitrary and capricious analyses.

75.     Judge Cooper stated that it "blinks reality to conclude that many of the ads considered by the Commissioners in this case were not designed to influence the election or defeat of a particular candidate in an ongoing race."  Nonetheless, the Petersen, Hunter, Goodman AAN Remand SoR once again reached that erroneous conclusion by finding only four of AAN's twenty electioneering communications, representing only 13.4 percent of AAN's spending on such ads, were designed to influence federal elections.  The Petersen, Hunter, Goodman AAN Remand SoR even found the advertisement that Judge Cooper quoted in full— AAN's ad accusing members of Congress of voting to give "Viagra for convicted sex offenders"—was *not* designed to influence elections.

76.     The Petersen, Hunter, Goodman AAN Remand SoR reached that conclusion by applying a standard of law based on impermissible interpretations of Supreme Court precedent. In particular, the Petersen, Hunter, Goodman AAN Remand SoR concluded that an ad which "relates to the speaker's issue agenda" and includes a "call to action" asking viewers to lobby their representative is not election-related.  That test rests on a truncated discussion of an ad the Supreme Court found to be political.  *See McConnell v. FEC*, 540 U.S. 93, 193 n.23 (2003) (discussing "Yellowtail" campaign ad which accused a candidate of hitting his wife, but also "vot[ing] against child support enforcement" and asked viewers to call the candidate and "[t]ell him to support family values").  The Petersen, Hunter, Goodman AAN Remand SoR ignored the fact that the referenced ad included a reference to a vote relating to the speakers' issue agenda and called on viewers to lobby the candidate.  Similarly, the Petersen, Hunter, Goodman AAN Remand SoR ignored other ads found to be political by the Supreme Court in *McConnell* which similarly took policy positions and called on viewers to lobby the representative on them.  Only by ignoring those salient facts could the Petersen, Hunter, Goodman AAN Remand SoR conclude that those factors could render an ad nonpolitical.

77.     Further, the Petersen, Hunter, Goodman AAN Remand SoR erroneously interpreted Judge Cooper's September 19 Order to prohibit the conclusion that all of AAN's electioneering communications were political, but Judge Cooper made no such pronouncement. The controlling commissioners' continued refusal to consider electioneering communications as indicative of a group's purpose to nominate or elect federal candidates is based on an impermissible interpretation of *Buckley* and Judge Cooper's judgment.

78.     The Petersen, Hunter, Goodman AAN Remand SoR is further arbitrary and capricious by unreasonably limiting the context that could be admitted for consideration,

ignoring relevant evidence instructive as to the advertisement's purposes, and drawing unsupported conclusions about what legislation could or would be before Congress.  The Petersen, Hunter, Goodman AAN Remand SoR further arbitrarily and capriciously failed to consider one of AAN's electioneering communications run against Rep. Perlmutter and further failed to consider the additional $1,124,152 AAN reported in political activity on its tax returns above and beyond the sums AAN reported spending on express advocacy, but which AAN maintains cannot be attributed to its electioneering communications.

79.     Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under 52 U.S.C. § 30109(a)(8) and has acted arbitrary or capriciously, abused its discretion, or acted contrary to law in dismissing on remand Plaintiffs' complaint against AAN.  Plaintiffs are further entitled to relief in the form of a declaratory order that the failure of the Commission to act in conformity with the Court's September 19, 2016 Order has given rise to Plaintiffs' cause of action against AAN under 52 U.S.C. § 30109(a)(8)(C) and Plaintiffs are therefore entitled to pursue a civil remedy against AAN directly.

## CLAIM TWO
### The FEC's Constructive Dismissal of the AJS Matter on Remand Is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law

80.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

81.     By failing to act on remand of the Plaintiffs' administrative complaint against AJS within the timeframe ordered by Judge Cooper in his September 19, 2016 Order, the FEC has constructively dismissed Plaintiffs' administrative complaint against AJS.  The FEC's constructive dismissal of Plaintiffs' complaint was arbitrary, capricious, an abuse of discretion,

and contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C) because it was not in conformity

with Judge Cooper's September 19 Order and would necessarily rest on impermissible

interpretations of law and arbitrary and capricious analyses.

82.    The FEC's failure to explain the constructive dismissal of Plaintiffs' complaint

against AJS renders the dismissal arbitrary, capricious, and abuse of discretion, and contrary to

law.

83.    Further, any justification offered would necessarily rest on impermissible

interpretations of law and arbitrary and capricious analyses. As the Goodman, Hunter, Petersen

AJS SoR recognized, AJS's express advocacy alone constituted about 40% of AJS's spending in

2010.  Accordingly, the only way the controlling commissioners could conclude that AJS's

spending in 2010 was not sufficiently extensive to conclude AJS's major purpose that year was

to nominate or elect candidates would be to once again treat all or nearly all of AJS's

electioneering communications as nonpolitical or to provide unreasonable weight to AJS's

historical activities, in violation of Judge Cooper's September 19, 2016 Order and contrary to

law.

84.    The controlling commissioners' failure to treat any of AJS's electioneering

communications as demonstrating a major purpose to nominate or elect candidates was arbitrary,

capricious, an abuse of discretion, and contrary to law.

85.    The controlling commissioners could only ignore AJS's extensive campaign

spending in 2010 by equally weighting AJS's current campaign activity with its long history of

other activity engaged in at times when it was illegal for AJS to spend on express advocacy or

electioneering communications.  Doing so would be arbitrary, capricious, an abuse of discretion

and contrary law, as well as not in conformity with the September 19, 2016 Order, as AJS's

activities clearly show AJS's major purpose changed when it became lawful for it to engage in federal campaign activities.

86.     Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under 52 U.S.C. § 30109(a)(8) and has acted arbitrary or capriciously, abused its discretion, or acted contrary to law in constructively dismissing on remand Plaintiffs' complaint against AJS.  Plaintiffs are further entitled to relief in the form of a declaratory order that the failure of the Commission to act in conformity with the Court's September 19, 2016 Order has given rise to Plaintiffs' cause of action against AJS under 52 U.S.C. § 30109(a)(8)(C) and Plaintiffs are therefore entitled to pursue a civil remedy against AJS directly.

**CLAIM THREE**
**The FEC Has Failed to Act on the AJS Matter on Remand**
**in Violation of the FECA and the Court's Order**

87.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

88.     By failing to act within the thirty day's provided by Judge Cooper's September 19, 2016 Order, the FEC "fail[ed] to act" in violation of 52 U.S.C. § 30109(a)(8)(C).  That failure was arbitrary, capricious, an abuse of discretion, and contrary to law.

89.     In the September 19 Order, Judge Cooper gave the FEC thirty days as provided by 52 U.S.C. § 30109(a)(8)(C) to correct their unlawful dismissal of Plaintiffs' administrative complaint against AJS and to act in conformity with the Court's declaration.  The thirty day period expired on October 19, 2016.  Despite the expiration of that time period, the FEC has neither informed Plaintiffs nor the Court of any actions related to AJS.  On information and belief, the AJS matter remains open before the Commission and the Commissioners have failed to take action consistent with the September 19 Order.

90.    Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under 52 U.S.C. § 30109(a)(8) and has acted arbitrary or capriciously, abused its discretion, or acted contrary to law in failing to act on remand on Plaintiffs' complaint against AJS.  Plaintiffs are further entitled to relief in the form of a declaratory order that the failure of the Commission to act in conformity with the Court's September 19, 2016 Order has given rise to Plaintiffs' cause of action against AJS under 52 U.S.C. § 30109(a)(8)(C) and Plaintiffs are therefore entitled to pursue a civil remedy against AJS directly.

## **REQUESTED RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court:

(1)    Declare that the FEC's dismissal of MUR 6589 (AAN) on remand was arbitrary, capricious, an abuse of discretion, and contrary to law;

(2)    Declare that the FEC's dismissal of MUR 6589 (AAN) on remand was not in conformity with Judge Cooper's September 19, 2010 Order;

(3)    Declare that the FEC's constructive dismissal of MUR 6538 (AJS) on remand was arbitrary, capricious, an abuse of discretion, and contrary to law;

(4)    Declare that the FEC's constructive dismissal of MUR 6538 (AJS) on remand was not in conformity with Judge Cooper's September 19, 2010 Order;

(5)    Declare that the FEC's failure to act on MUR 6538 (AJS) on remand was arbitrary, capricious, an abuse of discretion, and contrary to law;

(6)    Declare that the FEC's failure to act on MUR 6538 (AJS) on remand was not in conformity with Judge Cooper's September 19, 2010 Order;

(7)     Order the FEC to conform to such declaration within 30 days pursuant to 52

U.S.C. § 30109(a)(8)(C) or, alternatively, declare the FEC's failure to act in conformity with

Judge Cooper's September 19, 2010 Order on either AAN or AJS or both has given rise to

Plaintiffs' cause of action against AAN or AJS or both;

(8)     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees in this

action; and

(9)     Grant such other and further relief as the Court may deem just and proper.


Respectfully submitted,


STUART McPHAIL
smcphail@citizensforethics.org
(D.C. Bar No. 1032529)

ADAM J. RAPPAPORT
arappaport@citizensforethics.org
(D.C. Bar No. 479866)

Citizens for Responsibility and Ethics
   in Washington
455 Massachusetts Ave. N.W., Sixth Floor
Washington, D.C. 20001
Phone: (202) 408-5565
Facsimile: (202) 588-5020

November 14, 2016                    *Attorneys for Plaintiffs*