APPEAL,CLOSED,TYPE–C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:16–cv–02255–CRC</u>

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON et al v. FEDERAL ELECTION COMMISSION | Date Filed: 11/14/2016 |
| Assigned to: Judge Christopher R. Cooper | Date Terminated: 03/20/2018 |
|  Case:  1:18–cv–00945–CRC | Jury Demand: None |
| Cause: 02:431 Fed. Election Commission: Failure Enforce C | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON** | represented by | **Stuart C. McPhail** |
| | | CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON |
| | | 455 Massachusetts Avenue, NW |
| | | 6th Floor |
| | | Washington, DC 20001 |
| | | (202) 408–5565 |
| | | Fax: (202) 588–5020 |
| | | Email: smcphail@citizensforethics.org |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **MELANIE SLOAN** | represented by | **Stuart C. McPhail** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **FEDERAL ELECTION COMMISSION** | represented by | **Charles Kitcher** |
| | | FEDERAL ELECTION COMMISSION |
| | | 1050 First Street, NE |
| | | Washington, DC 20463 |
| | | (202) 694–1589 |
| | | Fax: (202) 219–3923 |
| | | Email: ckitcher@fec.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Erin R Chlopak** |
| | | FEDERAL ELECTION COMMISSION |
| | | 1050 First Street, NE |
| | | Washington, DC 20463 |
| | | (202) 694–1572 |
| | | Fax: (202) 219–3923 |
| | | Email: echlopak@fec.gov |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory John Mueller**
FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694–1650
Fax: (202) 219–3923
Email: gmueller@fec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Deeley**
FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694–1650
Fax: (202) 219–3923
Email: kdeeley@fec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

| | | |
|---|---|---|
| **AMERICAN ACTION NETWORK, INC.** | represented by | **Claire J. Evans** <br> WILEY REIN LLP <br> 1776 K Street, NW <br> Washington, DC 20006 <br> (202) 719–7022 <br> Email: cevans@wileyrein.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/14/2016 | 1 | | COMPLAINT against FEDERAL ELECTION COMMISSION ( Filing fee $ 400 receipt number 0090–4743444) filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. (Attachments: # 1 Exhibit 1, # 2 Civil Cover Sheet, # 3 Summons to FEC, # 4 Summons to AG, # 5 Summons to USAO)(McPhail, Stuart) (Entered: 11/14/2016) |
| 11/14/2016 | 2 | | NOTICE OF RELATED CASE by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. Case related to Case No. 14–cv–1419. (McPhail, Stuart) (Entered: 11/14/2016) |
| 11/14/2016 | 3 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON (McPhail, Stuart) (Entered: 11/14/2016) |

| 11/16/2016 | | | Case Assigned to Judge Christopher R. Cooper. (sb) (Entered: 11/16/2016) |
|---|---|---|---|
| 11/16/2016 | 4 | | SUMMONS (3) Issued Electronically as to FEDERAL ELECTION COMMISSION, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Consent Form)(sb) (Entered: 11/16/2016) |
| 01/18/2017 | 5 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 1/18/2017. ( Answer due for ALL FEDERAL DEFENDANTS by 3/19/2017.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 1/18/2017., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FEDERAL ELECTION COMMISSION served on 1/17/2017 (McPhail, Stuart) (Entered: 01/18/2017) |
| 03/10/2017 | 6 | | NOTICE of Appearance by Gregory John Mueller on behalf of FEDERAL ELECTION COMMISSION (Mueller, Gregory) (Entered: 03/10/2017) |
| 03/10/2017 | 7 | | Joint MOTION for Extension of Time to File Answer re 1 Complaint, *and Stipulation* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN (McPhail, Stuart) (Entered: 03/10/2017) |
| 03/15/2017 | | | MINUTE ORDER granting 7 Motion for Extension of Time to Answer: It is hereby ORDERED that Defendant shall respond to Plaintiff's Complaint no later than April 18, 2017. Signed by Judge Christopher R. Cooper on 3/15/2017. (lccrc1) (Entered: 03/15/2017) |
| 03/16/2017 | | | Set/Reset Deadlines: Answer due by 4/18/2017. (zlsj) (Entered: 03/16/2017) |
| 04/14/2017 | 8 | | AMENDED COMPLAINT against FEDERAL ELECTION COMMISSION filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. (Attachments: # 1 Exhibit, # 2 Certificate of Service)(McPhail, Stuart) (Entered: 04/14/2017) |
| 04/28/2017 | 9 | | Unopposed MOTION to Intervene by AMERICAN ACTION NETWORK, INC. (Attachments: # 1 Proposed Answer, # 2 Proposed Order)(Evans, Claire) (Entered: 04/28/2017) |
| 04/28/2017 | 10 | | Corporate Disclosure Statement by AMERICAN ACTION NETWORK, INC.. (Evans, Claire) (Entered: 04/28/2017) |
| 04/28/2017 | 11 | | NOTICE of Appearance by Charles Kitcher on behalf of FEDERAL ELECTION COMMISSION (Kitcher, Charles) (Entered: 04/28/2017) |
| 04/28/2017 | 12 | | NOTICE of Appearance by Gregory John Mueller on behalf of FEDERAL ELECTION COMMISSION (Mueller, Gregory) (Entered: 04/28/2017) |
| 04/28/2017 | 13 | | NOTICE of Appearance by Erin R Chlopak on behalf of FEDERAL ELECTION COMMISSION (Chlopak, Erin) (Entered: 04/28/2017) |
| 04/28/2017 | 14 | | NOTICE of Appearance by Kevin Deeley on behalf of FEDERAL ELECTION COMMISSION (Deeley, Kevin) (Entered: 04/28/2017) |
| 04/28/2017 | 15 | | ANSWER to 8 Amended Complaint by FEDERAL ELECTION COMMISSION. Related document: 8 Amended Complaint filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN.(Mueller, Gregory) (Entered: 04/28/2017) |

| 05/01/2017 | 16 | ORDER granting 9 Motion to Intervene. Signed by Judge Christopher R. Cooper on 5/1/2017. (lccrc1) (Entered: 05/01/2017) |
| --- | --- | --- |
| 05/01/2017 | | MINUTE ORDER: Before the Court in this case challenging administrative action are a complaint and an answer for each Defendant. It is hereby ORDERED that the parties shall promptly confer and, no later than May 16, 2017, file a joint proposed schedule, or separate proposed schedules if an agreement cannot be reached, for further proceedings. Signed by Judge Christopher R. Cooper on 5/1/2017. (lccrc1) (Entered: 05/01/2017) |
| 05/01/2017 | | Set/Reset Deadlines: Proposed Briefing Schedule due by 5/16/2017. (lsj) (Entered: 05/01/2017) |
| 05/16/2017 | 17 | Consent MOTION for Extension of Time to *Jointly Propose Schedule* by FEDERAL ELECTION COMMISSION (Attachments: # 1 Text of Proposed Order)(Mueller, Gregory) (Entered: 05/16/2017) |
| 05/17/2017 | | MINUTE ORDER granting 17 Motion for Extension of Time: It is hereby ORDERED that the parties shall file a joint proposed schedule for further proceedings no later than May 31, 2017. Signed by Judge Christopher R. Cooper on 5/17/2017. (lccrc1) (Entered: 05/17/2017) |
| 05/17/2017 | | Set/Reset Deadlines: Joint Proposed Briefing Schedule due by 5/31/2017 (lsj) (Entered: 05/17/2017) |
| 05/30/2017 | 18 | NOTICE *of Filing of its Certified List of the Contents of the Underlying Administrative Record* by FEDERAL ELECTION COMMISSION (Attachments: # 1 Exhibit –– Certified List of Contents of Administrative Record in MUR 6589R, # 2 Exhibit –– Certified List of Contents of Administrative Record in MUR 6589 filed in CREW v. FEC, 14–1419 (D.D.C.))(Mueller, Gregory) (Entered: 05/30/2017) |
| 05/31/2017 | 19 | PROPOSED BRIEFING SCHEDULE *and Meet and Confer Statement* by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit 1 –– Order, NRCC, No. 96–2295, 10–7–96, # 3 Exhibit 2 –– Order, NRCC, No. 96–2295, 10–23–96, # 4 Exhibit 3 –– Order, DSCC, 96–2184, 9–26–96, # 5 Exhibit 4 –– Order, DSCC, 95–349, 05–15–95, # 6 Exhibit 5 –– Order, Op. and Order, Common Cause, 87–2224, 2–10–88, # 7 Exhibit 6 –– Stip and Order, 96–764, 8–30–96)(Mueller, Gregory) (Attachment 5 replaced on 6/1/2017) (td). (Attachment 6 replaced on 6/1/2017) (td). (Attachment 6 replaced on 6/1/2017) (td). (Attachment 6 replaced on 6/1/2017) (td). (Entered: 05/31/2017) |
| 05/31/2017 | 20 | PROPOSED BRIEFING SCHEDULE *and Meet and Confer Statement* by AMERICAN ACTION NETWORK, INC.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Evans, Claire) (Entered: 05/31/2017) |
| 05/31/2017 | 21 | PROPOSED BRIEFING SCHEDULE *and Meet and Confer Statement* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Text of Proposed Order)(McPhail, Stuart) (Entered: 05/31/2017) |
| 05/31/2017 | 22 | MEET AND CONFER STATEMENT. (See Docket Entries 19 and 20 to view document(s) (jf) (Entered: 06/01/2017) |
| 06/14/2017 | 23 | |

| | | | |
|---|---|---|---|
| | | | SCHEDULING ORDER: It is hereby ORDERED that briefing in this case proceed according to the schedule in the accompanying ORDER. Signed by Judge Christopher R. Cooper on 6/14/2017. (lccrc1) (Entered: 06/14/2017) |
| 06/28/2017 | 24 | | Unopposed MOTION for Protective Order by FEDERAL ELECTION COMMISSION (Attachments: # 1 Text of Proposed Order)(Mueller, Gregory) (Entered: 06/28/2017) |
| 07/06/2017 | 25 | | Consent MOTION to Amend/Correct *the Scheduling Order* by AMERICAN ACTION NETWORK, INC. (Attachments: # 1 Text of Proposed Order)(Evans, Claire) Modified event title on 7/7/2017 (znmw). (Entered: 07/06/2017) |
| 07/06/2017 | 26 | | ORDER granting 24 Motion for Protective Order. Signed by Judge Christopher R. Cooper on 7/6/2017. (lccrc1) (Entered: 07/06/2017) |
| 07/10/2017 | 27 | | ORDER granting 25 Motion to Amend/Correct: It is hereby ORDERED that this case shall proceed according to the schedule in the accompanying Amended Scheduling Order. Signed by Judge Christopher R. Cooper on 7/10/2017. (lccrc1) (Entered: 07/10/2017) |
| 08/04/2017 | 28 | | MOTION for Summary Judgment *and REDACTED Memorandum in Support* by FEDERAL ELECTION COMMISSION (Attachments: # 1 Declaration REDACTED Declaration of Shanna M. Reulbach, # 2 Text of Proposed Order)(Kitcher, Charles) (Entered: 08/04/2017) |
| 08/04/2017 | 29 | | SEALED DOCUMENT filed by FEDERAL ELECTION COMMISSION re 28 MOTION for Summary Judgment *and REDACTED Memorandum in Support* (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration Declaration of Shanna M. Reulbach)(Kitcher, Charles) (Entered: 08/04/2017) |
| 08/04/2017 | 30 | | MOTION for Summary Judgment by AMERICAN ACTION NETWORK, INC. (Attachments: # 1 Text of Proposed Order)(Evans, Claire) (Entered: 08/04/2017) |
| 09/26/2017 | 31 | | SEALED MOTION filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN, SEALED OPPOSITION filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. re 30 MOTION for Summary Judgment , 28 MOTION for Summary Judgment *and REDACTED Memorandum in Support* (Attachments: # 1 Declaration of Stuart McPhail, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Text of Proposed Order)(McPhail, Stuart) (Entered: 09/26/2017) |
| 09/26/2017 | 32 | | MOTION for Summary Judgment *and REDACTED Memorandum in Support* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN (Attachments: # 1 Declaration of Stuart McPhail, # 2 Exhibit 1 (Filed Under Seal), # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Text of Proposed Order)(McPhail, Stuart) (Entered: 09/26/2017) |
| 09/26/2017 | 33 | | Memorandum in opposition to re 30 MOTION for Summary Judgment , 28 MOTION for Summary Judgment *and REDACTED Memorandum in Support with REDACTIONS (same as Plaintiffs' Motion for Summary Judgment)* filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. (Attachments: # 1 Declaration of Stuart McPhail, # 2 |

| | | | |
|---|---|---|---|
| | | | Exhibit 1 (Filed Under Seal), # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Text of Proposed Order)(McPhail, Stuart) (Entered: 09/26/2017) |
| 10/27/2017 | 34 | | Consent MOTION for Extension of Time to File Response/Reply by FEDERAL ELECTION COMMISSION (Attachments: # 1 Text of Proposed Order)(Mueller, Gregory) (Entered: 10/27/2017) |
| 10/30/2017 | 35 | | ORDER granting 34 Defendant's Motion to Amend Scheduling Order. Defendant Federal Election Commission's combined opposition/reply is due by 11/20/2017; Intervenor–Defendant AAN's combined opposition/reply is also due by 11/20/2017; Plaintiffs reply is due by 1/9/2018; joint appendix is due by 1/30/2018. Signed by Judge Christopher R. Cooper on 10/30/2017. (lccrc1) (Entered: 10/30/2017) |
| 11/20/2017 | 36 | | SEALED REPLY TO OPPOSITION filed by AMERICAN ACTION NETWORK, INC. re 30 MOTION for Summary Judgment (This document is SEALED and only available to authorized persons.)(Evans, Claire) (Entered: 11/20/2017) |
| 11/20/2017 | 37 | | SEALED OPPOSITION filed by AMERICAN ACTION NETWORK, INC.. re 31 Sealed Motion,, Sealed Opposition, (Attachments: # 1 Text of Proposed Order)(Evans, Claire) (Entered: 11/20/2017) |
| 11/20/2017 | 38 | | REPLY to opposition to motion re 30 MOTION for Summary Judgment *(REDACTED)* filed by AMERICAN ACTION NETWORK, INC.. (Evans, Claire) (Entered: 11/20/2017) |
| 11/20/2017 | 39 | | Memorandum in opposition to re 32 MOTION for Summary Judgment *and REDACTED Memorandum in Support (REDACTED)* filed by AMERICAN ACTION NETWORK, INC.. (Attachments: # 1 Text of Proposed Order)(Evans, Claire) (Entered: 11/20/2017) |
| 11/20/2017 | 40 | | REPLY to opposition to motion re 28 MOTION for Summary Judgment *and REDACTED Memorandum in Support REDACTED VERSION* filed by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Exhibit, # 2 Supplemental Declaration of Shanna Reulbach)(Mueller, Gregory) (Entered: 11/20/2017) |
| 11/20/2017 | 41 | | SEALED REPLY TO OPPOSITION filed by FEDERAL ELECTION COMMISSION re 31 Sealed Motion,, Sealed Opposition, (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Supplemental Declaration of Shanna Reulbach)(Mueller, Gregory) (Entered: 11/20/2017) |
| 11/20/2017 | 42 | | Memorandum in opposition to re 32 MOTION for Summary Judgment *and REDACTED Memorandum in Support REDACTED VERSION (same as FEC's Reply)* filed by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Exhibit, # 2 Supplemental Declaration of Shanna Reulbach, # 3 Text of Proposed Order)(Mueller, Gregory) (Entered: 11/20/2017) |
| 11/20/2017 | 43 | | SEALED OPPOSITION filed by FEDERAL ELECTION COMMISSION. re 31 Sealed Motion,, Sealed Opposition, (Attachments: # 1 Exhibit, # 2 Supplemental Declaration of Shanna Reulbach, # 3 Text of Proposed Order)(Mueller, Gregory) (Entered: 11/20/2017) |
| 01/05/2018 | 44 | | |

| | | | |
|---|---|---|---|
| | | | STIPULATION *OF PARTIAL DISMISSAL WITHOUT PREJUDICE* by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. (Attachments: # <u>1</u> Text of Proposed Order)(McPhail, Stuart) (Entered: 01/05/2018) |
| 01/09/2018 | <u>45</u> | | REPLY to opposition to motion re <u>32</u> MOTION for Summary Judgment *and REDACTED Memorandum in Support* filed by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. (Attachments: # <u>1</u> Declaration of Stuart McPhail, # <u>2</u> Exhibit 1, # <u>3</u> Exhibit 2, # <u>4</u> Exhibit 3, # <u>5</u> Exhibit 4, # <u>6</u> Exhibit 5, # <u>7</u> Exhibit 6, # <u>8</u> Exhibit 7, # <u>9</u> Exhibit 8, # <u>10</u> Exhibit 9, # <u>11</u> Exhibit 10, # <u>12</u> Exhibit 11, # <u>13</u> Exhibit 12, # <u>14</u> Exhibit 13, # <u>15</u> Exhibit 14, # <u>16</u> Exhibit 15, # <u>17</u> Exhibit 16, # <u>18</u> Exhibit 17)(McPhail, Stuart) (Entered: 01/09/2018) |
| 01/30/2018 | <u>46</u> | | JOINT APPENDIX by CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, MELANIE SLOAN. (Attachments: # <u>1</u> Appendix Part 2, # <u>2</u> Appendix Part 3)(McPhail, Stuart) (Entered: 01/30/2018) |
| 03/20/2018 | <u>47</u> | 40 | ORDER denying <u>28</u> Defendant Federal Election Commission's Motion for Summary Judgment; denying <u>30</u> Intervenor–Defendant American Action Network's Motion for Summary Judgment; and granting <u>31</u> , <u>32</u> Plaintiffs' Cross–Motion for Summary Judgment. Signed by Judge Christopher R. Cooper on 3/20/2018. (lccrc1) (Entered: 03/20/2018) |
| 03/20/2018 | <u>48</u> | 10 | MEMORANDUM OPINION re <u>47</u> Order. Signed by Judge Christopher R. Cooper on 3/20/2018. (lccrc1) (Entered: 03/20/2018) |
| 05/04/2018 | <u>49</u> | 8 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>47</u> Order on Motion for Summary Judgment,,,,, <u>48</u> Memorandum & Opinion by AMERICAN ACTION NETWORK, INC.. Filing fee $ 505, receipt number 0090–5463842. Fee Status: Fee Paid. Parties have been notified. (Evans, Claire) (Entered: 05/04/2018) |

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

                Plaintiffs,

       v.

FEDERAL ELECTION COMMISSION,

                Defendant,

AMERICAN ACTION NETWORK,

                Intervenor-Defendant.

Civil No. 16-cv-2255 (CRC)

## NOTICE OF APPEAL

        Intervenor-Defendant American Action Network appeals to the United States Court of

Appeals for the District of Columbia Circuit from the March 20, 2018 judgment of the district

court (Dkt. Nos. 47 (order) and 48 (memorandum opinion)) granting Plaintiffs' cross-motion for

summary judgment and denying the Federal Election Commission's and American Action

Network's motions for summary judgment, as well as from all orders and rulings merged therein,

including without limitation the September 19, 2016 memorandum opinion and order entered in

related Case No. 14-cv-01419 (CRC) at Dkt. Nos. 52 (memorandum opinion) and 53 (order).

                Respectfully submitted,

                */s/ Claire J. Evans*
                Jan Witold Baran (D.C. Bar No. 233486)
                Caleb P. Burns (D.C. Bar No. 474923)
                Claire J. Evans (D.C. Bar No. 992271)
                Wiley Rein LLP
                1776 K Street NW
                Washington, DC 20006
                Tel.: 202.719.7000
                Fax: 202.719.7049

May 4, 2018                *Counsel for American Action Network*

## CERTIFICATE OF SERVICE

   I hereby certify that, on May 4, 2018, a true and correct copy of American Action Network's notice of appeal was filed and served electronically through the Court's CM/ECF system upon the following counsel of record:

  Charles Kitcher
  Erin R. Chlopak
  Gregory J. Mueller
  Kevin Deeley
  Federal Election Commission
  Office of General Counsel
  1050 First Street, NE
  Washington, DC 20463

  Stuart C. McPhail
  Adam J. Rappaport
  Citizens for Responsibility and Ethics in Washington
  455 Massachusetts Avenue, N.W.
  6th Floor
  Washington, DC 20001

         */s/ Claire J. Evans*
         Claire J. Evans

2

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

          Plaintiffs,

          v.

FEDERAL ELECTION COMMISSION,

          Defendant,

AMERICAN ACTION NETWORK, INC.,

          Intervenor Defendant.

Case No. 16-cv-2255 (CRC)

## MEMORANDUM OPINION

This is the second in a series of cases involving the Federal Election Commission and its (non)regulation of American Action Network, Inc. ("AAN"), a self-described "issue-oriented action tank" that ran nearly $18 million in television advertisements just before the 2010 federal midterm elections. Citizens for Responsibility and Ethics in Washington—a watchdog group known as "CREW"—contends that AAN's spending on these ads rendered it a "political committee" as defined in the Federal Election Campaign Act of 1971. And, according to CREW, because AAN did not register as a political committee during the relevant time period, it evaded the Act's recordkeeping and disclosure requirements that apply to those groups.

In 2012, CREW filed an administrative complaint with the Commission to that effect. By an evenly divided vote, the Commission dismissed CREW's complaint because a majority of the Commissioners did not find "reason to believe" that AAN violated the Act. 52 U.S.C. § 30109(a)(2). Specifically, the three controlling Commissioners concluded that AAN did not

qualify as a political committee because it lacked a "major purpose" of nominating or electing a candidate for federal office, <u>Buckley v. Valeo</u>, 424 U.S. 1, 79 (1976). This Court in a previous decision held that dismissal "contrary to law" because it rested on an erroneous premise regarding <u>Buckley</u>'s "major purpose" requirement. On remand, the Commission again dismissed CREW's complaint in a deadlocked decision.

CREW then filed this suit challenging the Commission's second dismissal as contrary to law. Because the Court finds that the Commission's analysis was inconsistent with the governing statutes, it will grant summary judgment in favor of CREW and remand this matter to the Commission.

## I. Background

### A. Legal Background

The Federal Election Campaign Act of 1971 ("FECA"), as substantially amended in 1974, regulates federal elections in two key ways. First, the law sets monetary limits on contributions to political parties and candidates. <u>See</u> 52 U.S.C. § 30116. Second, it imposes disclosure requirements on entities that spend money for the purpose of influencing elections, even when that spending does not go directly to a candidate's coffers. <u>See</u> <u>id.</u> § 30104.

This case is about FECA's disclosure requirements—specifically, those triggered by spending on political advertisements. In broad terms, these disclosure requirements serve "three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act." <u>McConnell v. FEC</u>, 540 U.S. 93, 121 (2003) (controlling opinion of Stevens & O'Connor, J.J.).

2

Some of FECA's disclosure requirements are triggered by certain types of communications. For example, an entity that makes "independent expenditures"—that is, a communication "expressly advocating the election or defeat of a clearly identified candidate," 52 U.S.C. § 30101(17)—of over $250 in a calendar year must file a report with the Commission containing information about itself and its contributors, id. § 30104(c).

FECA also imposes more pervasive disclosure requirements on entities based on their campaign-related spending patterns. As relevant here, "political committees"—commonly referred to as "political action committees" or "PACs"—are subject to extensive, ongoing disclosure requirements. They must appoint a treasurer, keep records with the names and addresses of contributors, and file regular reports during a general election year with accounting information, including the amounts spent on contributions and expenditures. Id. §§ 30102–04. They must also register with the Federal Election Commission or face penalties. Id. §§ 30104(a)–(b), 30109(d)(1).

An entity qualifies as a political committee when it satisfies two separate conditions. The first was imposed by Congress in the text of FECA: the entity must receive or spend more than $1,000 in a calendar year for the purpose of influencing a federal election. Id. § 30101(4)(A), (8)(A)(i), (9)(A)(i).[1] The second condition was imposed by the Supreme Court in Buckley v. Valeo as a narrowing construction of the statutory definition. Under Buckley, political committees are limited to those "organizations that are under the control of a candidate or *the*

---

[1] More precisely, FECA defines "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A). "Contributions" and "expenditures" are both restricted to payments made "for the purpose of influencing any election for Federal office." Id. § 30101(8)(A)(i), (9)(A)(i).

3

*major purpose of which is the nomination or election of a candidate*." 424 U.S. at 79 (emphasis added). A broader definition of "political committee," the Court explained, could raise problems of vagueness under the First Amendment by threatening the speech of "groups engaged purely in issue discussion" and not just those engaged in "campaign related" activity. Id.

Several decades after Buckley, Congress in the Bipartisan Campaign Reform Act of 2002 ("BCRA") amended FECA to add important new disclosure requirements. BCRA was aimed, among other targets, at the post-Buckley rise of corporate and union spending on ads that were nominally related to political issues but were clearly intended to sway voters in upcoming federal elections. See McConnell, 540 U.S. at 126–32. To capture these "so-called issue ads," id. at 126, Congress created a new category of communications called "electioneering communications"—television advertisements that air within 60 days of a federal election, clearly identify a candidate running for federal office, and target the relevant electorate. 52 U.S.C. § 30104(f)(3)(A)(i). Corporations spending over \$10,000 on those communications in a calendar year must file a statement with the Commission that discloses information about the entity, the candidates identified in the communications, the recipients of any disbursements, and any donors who gave over \$1,000 toward electioneering communications since the beginning of the preceding calendar year. Id. § 30104(f)(2); 11 C.F.R. § 104.20(c)(9).[2] Ads that qualify as electioneering communications must also include disclaimers with information like the name of

_____

[2] More specifically, FECA requires electioneering communication reports to contain "the names and addresses of all contributors who contributed an aggregate amount of \$1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date." 52 U.S.C. § 30104(f)(2)(F). With respect to corporations like AAN, the Commission by regulation has interpreted the statute's reference to such contributors as limited to donations "*made for the purpose of furthering electioneering communications*." 11 C.F.R. § 104.20(c)(9) (emphasis added). The D.C. Circuit has upheld this "purpose requirement" against challenge under the Administrative Procedure Act. Van Hollen, Jr. v. FEC, 811 F.3d 486, 489–90 (D.C. Cir. 2016).

4

the entity that paid for the ad and whether the ad was authorized by a candidate. 52 U.S.C. § 30120(a); see 11 C.F.R. § 100.11(c)(3).

The Federal Election Commission ("FEC"), an independent agency with six Commissioners, is responsible for enforcing FECA's disclosure requirements. See 52 U.S.C. § 30106(b)(1). The Commission has not adopted a rule that further clarifies the meaning of Buckley's "major purpose" limitation. Rather, it has taken a case-by-case approach by deciding whether particular entities have a major purpose of nominating or electing a candidate. See Shays v. FEC, 511 F. Supp. 2d 19, 30 (D.D.C. 2006). This approach was ultimately upheld by a fellow judge in this District against challenge under the Administrative Procedure Act. See id.

Any person or entity may file a complaint with the Commission asserting a FECA violation. 52 U.S.C. § 30109(a)(1). If four or more Commissioners find "reason to believe" that FECA was or will soon be violated, then the Commission must investigate. Id. § 30109(a)(2). Otherwise, the complaint is dismissed. See id. § 30106(c). In the event of dismissal, the controlling group of Commissioners—here, those voting against enforcement—must provide a statement of reasons explaining the dismissal decision. See FEC v. Nat'l Republican Senatorial Comm. ("NRSC"), 966 F.2d 1471, 1476 (D.C. Cir. 1992). "Any party aggrieved" by an FEC dismissal decision may petition for this Court's review. 52 U.S.C. § 30109(a)(8)(A). If the Court finds the statement of reasons to be contrary to law, it can direct the FEC to take action within 30 days that "conforms with" the Court's ruling. Id. § 30109(a)(8)(C).

B. Factual and Procedural Background

1. *The FEC's First Dismissal*

American Action Network ("AAN") is a tax-exempt § 501(c)(4) civic organization. Joint Appendix ("J.A.") 1490–91 (ECF No. 46). The group's stated mission is to "create, encourage

and promote center-right policies based on the principles of freedom, limited government, American exceptionalism, and strong national security." J.A. 1490. To advance that mission, AAN has sponsored educational activities and grassroots events. But the majority of its spending throughout the period at issue in this case—July 23, 2009 through June 30, 2011[3]—was on political advertisements. Of its $27.1 million in total spending over that period, just over $4 million was devoted to independent expenditures—*i.e.*, ads expressly advocating for or against a federal candidate. J.A. 1765. An additional $13.7 million was devoted to electioneering communications—*i.e.*, ads run near an election that identify a candidate and target the relevant electorate. Id.

In June 2012, CREW and its then–executive director filed a complaint with the FEC alleging that AAN's spending near the 2010 midterms rendered it an unregistered political committee. J.A. 1480–88. The FEC's Office of General Counsel reviewed the complaint and recommended that the Commission investigate it because there was reason to believe that AAN was indeed a political committee. Id. at 1659. Nevertheless, in June 2014, the Commissioners deadlocked three-to-three on whether to commence an investigation and, accordingly, the Commission dismissed CREW's complaint. Id. at 1689.

The three controlling Commissioners—those voting against investigation—issued a Statement of Reasons explaining that AAN was not a political committee because it did not have a major purpose of nominating or electing a federal candidate. J.A. 1690–723. The Commissioners first explained that, based on AAN's organizational documents, its official public statements, and its tax-exempt status, AAN appeared to have a "central organizational

---

[3] This timespan covers AAN's spending as reported in two of its tax returns: one return covering July 23, 2009 through June 30, 2010; and the other covering July 1, 2010 through June 30, 2011. J.A. 1490, 1518.

6

purpose" that was "issue-centric" and not focused on electing candidates. Id. at 1706–07. They then turned to the heart of CREW's complaint: that AAN's spending on advertisements rendered it a political committee. Id. at 1708. In this part of their analysis, the Commissioners relied on a rigid distinction between "express advocacy" for a candidate—which properly counted toward an electoral major purpose—and "issue advocacy"—which categorically did not. See id. at 1709–10. In the Commissioners' view, the Supreme Court had interpreted the First Amendment to require such a categorical distinction—first in Buckley and more recently in FEC v. Wisconsin Right to Life, Inc. ("WRTL II"), 551 U.S. 449 (2007), which held that a statute prohibiting corporations from funding electioneering communications could not, consistent with the First Amendment, be applied to forbid the funding of "genuine issue ads" that are not "the functional equivalent of express advocacy," id. at 480–81.[4] See J.A. 1704–05, 1709.

Relying on the dichotomy between express and issue advocacy from WRTL II, the Commissioners characterized all of AAN's ads that did not expressly advocate for a candidate (*i.e.*, its electioneering communications) as "genuine issue advertisements," the $13.7 million cost of which could not be counted toward an election-related major purpose. J.A. 1709–10. They made this determination wholesale, without discussing the content of any individual ad. Id. The Commissioners also considered AAN's spending over its lifetime—mid-2009 to mid-2011—instead of year-to-year and, in total, found that only the $4.1 million that AAN spent on express advocacy between 2009 and 2011 was aimed to elect a candidate. Id. at 1709. In their view, because that spending accounted for only 15% of AAN's total expenses during that period,

_____

[4] A few years after WRTL II, the Supreme Court in Citizens United, 558 U.S. 310 (2010), "pulled the plug on this ban once and for all, ruling unconstitutional the prohibition on corporate- and union-funded 'express advocacy.'" Van Hollen Jr., 811 F.3d at 490 n.1.

7

the group necessarily lacked a major purpose of nominating or electing a candidate. Id. at 1709–10, 1716.

CREW filed suit in this Court challenging the FEC's dismissal of the complaint against AAN, as well as the dismissal of a similar complaint against another organization, Americans for Job Security ("AJS"). CREW v. FEC, 209 F. Supp. 3d 77, 80–81 (D.D.C. 2016). CREW alleged that both dismissals violated FECA.[5] AAN and AJS intervened as additional defendants and the parties filed cross-motions for summary judgment. Id. at 85.

In a September 2016 decision, this Court held that both dismissals were contrary to law and remanded them to the Commission for reconsideration. Id. at 95. As the Court explained, the FEC's reliance on a hard distinction between express advocacy and issue advocacy depended on an erroneous premise: that the First Amendment required it to exclude from its consideration all non-express advocacy in the context of *disclosure requirements*. Id. at 93. While the Supreme Court in WRTL II had concededly drawn such a distinction in evaluating a *ban* on corporate-sponsored electioneering communications, in McConnell and Citizens United v. FEC, 558 U.S. 310 (2010), it had expressly declined to take that approach in evaluating disclosure requirements triggered by those communications. Id. at 89–90 (quoting Citizens United, 558 U.S. at 369). And in the wake of those cases, "federal appellate courts ha[d] resoundingly concluded that WRTL II's constitutional division between express advocacy and issue speech is simply inapposite in the disclosure context." Id. at 90.

_____

[5] CREW initially brought a claim under the Administrative Procedure Act ("APA"). This Court dismissed that claim on the ground that FECA provided CREW with an "adequate remedy" and therefore precluded review of the FEC's determination under the APA. CREW v. FEC, 164 F. Supp. 3d 113, 120 (D.D.C. 2015).

8

This Court nevertheless declined to adopt CREW's proposed rule that, to comply with

FECA, the Commission must treat *all* electioneering communications as indicative of an

election-related major purpose. As the Court explained:

> CREW's citations to legislative history, past FEC precedent, and court precedent certainly support the conclusion that *many* or even *most* electioneering communications indicate a campaign-related purpose. Indeed, it blinks reality to conclude that many of the ads considered by the Commissioners in this case were not designed to influence the election or defeat of a particular candidate in an ongoing race. However, particularly given the FEC's judicially approved case-by-case approach to adjudicating political committee status, the Court will refrain from replacing the Commissioners' bright-line rule with one of its own.

Id. at 93 (citations omitted).

### 2. *The FEC's Second Dismissal*

On remand, the FEC again divided three-to-three and dismissed CREW's complaint

against AAN. J.A. 1763. The controlling Commissioners' Statement of Reasons acknowledged

that, in light of this Court's decision, it could no longer categorically exclude AAN's

electioneering communications from its major-purpose calculation. Id. at 1767–68. Rather, the

Commissioners explained that they would proceed ad-by-ad and weigh several factors in

deciding whether each electioneering communication should count toward an election-related

major purpose. These factors included (1) the extent to which the ad's language focuses on

"elections, voting, political parties," and the like; (2) "the extent to which the ad focuses on

issues important to the group or merely the candidates referenced in the ad"; (3) the context of

the ad (but "only to the extent necessary . . . to understand better the message being conveyed");

and (4) whether the ad "contains a call to action and, if so, whether the call relates to the . . .

issue agenda or, rather, to the election or defeat of federal candidates." Id. at 1768.

Before they turned to each ad, the Commissioners explained that all of the ads ran in a

time period that—while admittedly near the federal midterm elections—also preceded an

anticipated "lame duck" congressional session.  J.A. 1768–70.  During that session, Congress was expected to "consider several pieces of major legislation, many involving policy issues of great importance to AAN" like "Bush-era tax cuts, federal spending, health care, and energy."  Id. at 1769.  And, as the Commission noted, Congress did ultimately convene a lame duck session in December 2010 and considered some of those issues.  Id. at 1769–70.

"With that context in mind," the controlling Commissioners then evaluated AAN's twenty electioneering communications.  J.A. 1770.  They concluded that four of the ads indicated an election-related major purpose: those titled "Bucket," [6] "New Hampshire," [7] "Order," [8] and "Extreme." [9]  Id. at 1779.  "Order" and "Extreme," for example, sought to criticize two Democratic congressional candidates—Mike Oliverio and Annie Kuster, respectively—by linking them with Nancy Pelosi in unfavorable ways.  Id. at 1778.  As the Commissioners

---

[6] "We send tax money to Washington and what does Russ Feingold do with it?  Eight hundred billion dollars for the jobless stimulus.  Two point five million for a healthcare plan that hurts seniors.  A budget that forces us to borrow nine million dollars.  And when he had a chance at reform, he voted against the Balanced Budget Amendment.  Russ Feingold and our money.  What a mess. [Superimposed text: Russ Feingold, What a mess.]"  J.A. 1773.

[7] "Winter's here soon.  Guess Congressman Hodes has never spent nights sleepless, unable to pay utility bills.  Why else would he vote for the cap-and-trade tax?  Raise electric rates by ninety percent?  Increase gas to four dollars?  Cost us another two million jobs?  Kelly Ayotte would stop the cap-and-trade tax.  Cold."  J.A. 1777.

[8] "[On screen text:] If Nancy Pelosi gave an order . . . would you follow it?  Mike Oliverio would.  Oliverio says he would support Pelosi in Washington.  After all, Oliverio voted himself a 33% pay raise.  Oliverio voted for higher taxes.  Even on gas.  And Oliverio won't repeal Obama's $500 billion Medicare cuts. So what will Mike Oliverio do in Washington?  Whatever Nancy Pelosi tells him to."  J.A. 1778.

[9] "[On screen text:] Nancy Pelosi is not extreme.  Compared to Annie Kuster.  Kuster supported the trillion dollar government Healthcare takeover.  But says it didn't go far enough.  $525 billion in new taxes for government Healthcare.  Now, Kuster wants $700 billion in higher taxes on families and businesses.  And $846 billion in job killing taxes for cap and trade.  Nancy Pelosi is not extreme.  Compared to Annie Kuster."  J.A. 1778.

10

explained, "[n]either ad contains a call to action, nor do they focus on changing the voting behavior or policy stances of the named individuals." Id. Thus, in their view, those ads were best understood as aiming to defeat reelection of the named representatives.

On the other hand, the Commissioners found that AAN's sixteen other electioneering communications did not evince an election-related purpose. Conceding that these ads were critical of the incumbent representatives they identified, the Commissioners focused on the fact that each ad instructed viewers to call the representative and urge him to change his vote on a political issue, if not an actual pending bill. See id. at 1770–79. For example, the Commissioners declined to count the cost of an ad titled "Quit Critz," which accused then-Pennsylvania representative Mark Critz of supporting "the Obama-Pelosi agenda that's left us fourteen trillion in debt." J.A. 1770. The ad concluded with an exhortation to "[t]ell Congressman Critz that Pennsylvania families need tax relief this November, not more government," and it superimposed text that instructed viewers to call Representative Critz and tell him to vote "Yes on H.R. 4746," the House tax-cut bill introduced earlier that year. Id. In evaluating that ad and several similar to it,[10] the Commissioners explained that the ads' references to "November" were "best understood as a reference to the time period in which the

---

[10] For example, another tax-related ad titled "Wallpaper":

Congressman Kurt Schrader is wallpapering Washington with our tax money. Schrader spent nearly eight hundred billion on the wasteful stimulus that created few jobs but allowed big executive bonuses. He threw nearly a trillion at Pelosi's health care takeover and voted to raise the national debt to over fourteen trillion. Now Congress wants to raise taxes. Call Congressman Schrader. Tell him to vote for a tax cut this November to stop wallpapering Washington with our tax dollars. [Superimposed text: "Call Congressman Schrader this November. Vote to cut taxes. Yes on H.R. 4746. (202) 224–3121."]

J.A. 1771.

11

lame-duck session would commence" instead of a reference to the November midterm election, and that "the express point of [their] criticism" was "to marshal public sentiment to persuade the officeholders to alter their voting stances." J.A. 1772.

Combining AAN's spending on the four election-related ads with the $4.1 million it spent on express advocacy yielded a sum of $5.97 million, or 22% of AAN's total spending between mid-2009 and mid-2011. J.A. 1779. The Commissioners ran an alternative calculation by adding the cost of an ad called "Read This"[11]—which they considered issue-focused but close to the line—and by counting AAN's spending over only the most recent year in question (mid-2010 to mid-2011). Id. Under that approach, "the amount of spending that indicate[d] a purpose to nominate or elect federal candidates would constitute less than 28% of [AAN's] total spending in that time period." Id. As a result, the Commissioners concluded that AAN did not have the requisite major purpose of nominating or electing a candidate, and they therefore voted to dismiss CREW's complaint against AAN.[12] Id. at 1779–80.

Soon thereafter, CREW filed a motion for an order to show cause why the FEC's dismissal on remand did not contravene this Court's prior decision. Pls.' Mot. Show Cause, No. 14-cv-1419 (Nov. 14, 2016) (ECF No. 57). The Court denied the motion. Memo. Op. & Order, id. (Apr. 6, 2017) (ECF No. 74). To the extent that CREW's motion relied on *new* legal

---

[11] "[On screen text:] Rick Boucher wants to keep you in the dark. About his Washington Cap and Trade deal. Boucher sided with Nancy Pelosi. For billions in new energy taxes. That will kill thousands of Virginia jobs. But Rick Boucher didn't just vote for Cap and Trade. The Siena Club called Boucher the "linchpin" of the entire deal. Call Rick Boucher. [Phone number at top of screen.] Tell him no more deals." J.A. 1777.

[12] The three Commissioners who voted to investigate AAN issued their own statement of reasons, in which they excoriated the controlling Commissioners for "ignor[ing] the court's ruling and the plain language of the ads that objectively criticized candidates in the weeks preceding the 2010 elections." J.A. 1785.

12

arguments—for example, that the Commissioners relied on a misreading of <u>McConnell</u>—the Court explained that those new arguments were "properly taken up in a separate suit." <u>Id.</u> at 5. The Court further found that nothing in the Commissioners' dismissal violated the letter of its prior decision:

> [T]he Court never ordered the FEC to reach a particular result, or to consider any particular ad—or any proportion of electioneering communications—election-related. Instead, the Court directed the FEC to reconsider its decision without "exclud[ing] from its [major purpose] consideration all non-express advocacy." The FEC did just that.

<u>Id.</u> at 6 (citation omitted).

CREW then filed this suit against the FEC. AAN and AJS again intervened as defendants. The parties stipulated to dismissal of the claims against AJS, and thus all that remains is the allegation that the FEC's dismissal of the complaint against AAN was contrary to law. The parties' cross-motions for summary judgment are now ripe.

## II. Legal Standards

Where a party challenges an FEC dismissal decision, this Court will grant summary judgment to the challenger only if the agency's decision was "contrary to law," 52 U.S.C. § 30109(a)(8)(C), meaning either that "the FEC dismissed the complaint as a result of an impermissible interpretation of [FECA]," or that "the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." <u>Orloski v. FEC</u>, 795 F.2d 156, 161 (D.C. Cir. 1986). This same standard of review applies to all FEC decisions, whether they be unanimous or determined by tie vote. <u>In re Sealed Case</u>, 223 F.3d 775, 779 (D.C. Cir. 2000). This is because the Commissioners voting for dismissal "constitute a controlling group for purposes of the decision," and so their statement of reasons "necessarily states the agency's reasons for acting as it did." <u>NRSC</u>, 966 F.2d at 1476.

13

In evaluating whether a group has an election-related major purpose, the Commission is construing the term "political committee" as it appears in FECA—a statute that the Commission is charged with enforcing. The Court thus reviews the Commission's determination of whether an entity is a political committee using the framework set forth in <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984). <u>See, e.g.</u>, <u>Orloski</u>, 795 F.2d at 161–62. Under <u>Chevron</u>, the Court at "Step 1" must use "traditional tools of statutory interpretation" to decide "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842–43 & n.9; <u>see also</u> <u>Pharm. Research & Mfrs. Of Am. v. Thompson</u>, 251 F.3d 219, 224 (D.C. Cir. 2001) (examining "text, structure, purpose, and legislative history"). If so, then Congress's resolution must be given legal effect no matter what the agency says to the contrary. <u>Chevron</u>, 467 U.S. at 843. If, on the other hand, the statute is silent or ambiguous on an issue, the Court proceeds to "Step 2" and decides whether the agency's resolution of the issue was "a reasonable policy choice for the agency to make." <u>Id.</u> at 845. While the Court's review at Step 1 is plenary, at Step 2 it is "highly deferential." <u>Nat'l Rifle Ass'n of Am., Inc. v. Reno</u>, 216 F.3d 122, 137 (D.C. Cir. 2000).

This Court also reviews whether the FEC's dismissal was "arbitrary or capricious, or an abuse of discretion." <u>Orloski</u>, 795 F.2d at 161. This standard largely overlaps with <u>Chevron</u> Step 2; the same core question is whether the agency analyzed the problem reasonably. <u>See</u> <u>Pharm. Research & Mfrs. of Am. v. FTC</u>, 790 F.3d 198, 209 (D.C. Cir. 2015). The Court will hold an FEC decision unlawful if it "entirely failed to consider an important aspect of the problem," it "offered an explanation for its decision that runs counter to the evidence before [it]," or "is so implausible that it could not be ascribed to a difference in view or the product of agency

14

expertise." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Autom. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

## III. Analysis

CREW contends that the controlling Commissioners' analysis on remand rested on legal errors—some repeated and some new. It first claims that the Commissioners "fabricated" a multifactor test that allowed it to disregard nearly all of AAN's electioneering advertisements, in violation of this Court's prior decision. Pls.' Mot. Summ J. at 22. More fundamentally, says CREW, the Commission's dismissal rested on a misinterpretation of <u>Buckley</u> and <u>McConnell</u> because it invoked those cases as a reason to *exclude* electioneering communications from its major purpose analysis. <u>Id.</u> at 28–33. In CREW's view, those cases require just the opposite "because every electioneering communication, by reason of its being an electioneering communication, is 'specifically intended to affect election results.'" Pls.' Reply at 13–14 (quoting <u>McConnell</u>, 540 U.S. at 127). Finally, CREW argues that the Commission's analysis was arbitrary and capricious because it ignored contextual evidence highly relevant to the ads' purpose and instead "cherry picked information" in order to "excus[e] AAN from political reporting." Pls.' Mot. Summ. J. at 41.

As the Court explained in denying CREW's motion for a show-cause order, the controlling Commissioners did not repeat their mistake of drawing a bright line between express and issue advocacy. The Court nevertheless finds legal error in the Commission's approach to analyzing AAN's status as a political committee. While the controlling Commissioners did not categorically refuse to count AAN's electioneering advertisements as indicative of an election-related major purpose, the Commissioners used a multifactor test that started from a blank slate in considering the content of each ad, with no apparent regard for the highly relevant fact that

15

each ad fell cleanly within Congress's definition of an "electioneering communication."  In the

Court's view, that approach violates the unambiguous directive of Congress—made clear in the

Bipartisan Campaign Reform Act of 2002—that electioneering communications *presumptively*

have an election-related purpose.  In turn, to the extent that the Commission considers an entity's

spending in assessing its major purpose, it must presumptively treat spending on electioneering

ads as indicating a purpose of nominating or electing a candidate.

    A.  <u>In FECA and BCRA, Congress Made Clear that Electioneering Ads Presumptively Have a Purpose of Nominating or Electing a Federal Candidate</u>

To understand the Court's conclusion, begin with the plain text of FECA.  Its definition

of "political committee" is unambiguously broad: it covers any entity that receives or spends

over $1,000 within one calendar year for the purpose of influencing an election.  If this is all the

Court had to go on—and if it could disregard <u>Buckley</u>'s constitutional concerns—it would

conclude that AAN is a political committee under the clear terms of FECA, and therefore that the

Commission was bound to determine as much.  <u>See</u> <u>Akins v. FEC</u>, 101 F.3d 731, 740 (D.C. Cir.

1996) (en banc) (with respect to the definition of "political committee," "it cannot be[]

contended that the statutory language *itself* is ambiguous" (emphasis added)), *vacated on other

grounds*, 524 U.S. 11 (1998).

Of course, after <u>Buckley</u> the Commission is not free to rely on this broad statutory

definition alone.  The question, then, is how the Supreme Court's imposition of the major

purpose requirement changes things.  Here, the context of <u>Buckley</u>'s holding is important.  The

<u>Buckley</u> Court faced a wide-ranging constitutional challenge to FECA after it was amended in

1974.  Before reaching the Act's disclosure requirements, the Court first confronted the Act's

$1,000 annual limit on expenditures "relative to a clearly identified candidate during a calendar

year."  424 U.S. at 39.  The Court attempted to narrow this language to avoid vagueness

16

problems under the First Amendment by construing it "to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." Id. at 44. Even with that narrowing construction, however, the Court found the provision invalid because the government's purported interest "in preventing corruption and the appearance of corruption" did not support such a broad speech restriction. Id. at 45.

By contrast, the Court upheld several of FECA's disclosure requirements. But it imposed narrowing constructions on those requirements to avoid problems of vagueness and overbreadth under the First Amendment. For the disclosure requirements triggered by independent expenditures, the Court worried that the Act's definition of "expenditure"—which required only a purpose of "influencing" an election or nomination—could be read to cover "both issue discussion and advocacy of a political result." Id. at 79. So "[t]o insure that the reach of the [provision] is not impermissibly broad," the Court construed the term "expenditure" "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." Id. at 80. This meant that, to trigger the Act's disclosure requirements, a communication would need to contain "express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [or] 'reject,'" Id. at 44 n.52; see id. at 80 & n.108. These expressions have since been called Buckley's "magic words." McConnell, 540 U.S. at 126.

The Buckley Court then reached a similar conclusion with respect to disclosure requirements triggered by "political committee" status. As the Court explained:

> The general requirement that "political committees" and candidates disclose their expenditures could raise similar vagueness problems, for "political committee" is defined only in terms of amount of annual "contributions" and "expenditures," and could be interpreted to reach groups engaged purely in issue discussion. The lower

17

courts have construed the words "political committee" more narrowly. To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate.

424 U.S. at 79. Thus, the "major purpose" requirement was born.

Absent any congressional action in the decades since Buckley, this Court might find it unclear whether ads (1) mentioning candidates and (2) airing near elections but (3) not using Buckley's "magic words" should count toward an election-related major purpose. But in passing the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Congress unambiguously expressed its will on this issue and foreclosed the approach that the Commission took here.

In BCRA, Congress sought to mitigate two perceived problems with federal election financing that were prompted (at least in part) by Buckley. Title I of the Act was "Congress' effort to plug the soft-money loophole"—that is, the ability to have money contributed to state and local political parties effectively channeled to national parties while evading FECA's contribution limits and disclosure requirements. McConnell, 540 U.S. at 133. Title II, the provision relevant here, aimed to stem the tide of advertisements nominally targeted at issues but airing near elections—a tide that swelled after Buckley. Id. at 122. Specifically, "[a]s a result of [Buckley's] strict reading of the statute, the use or omission of 'magic words' such as 'Elect John Smith' or 'Vote Against Jane Doe' marked a bright statutory line separating 'express advocacy' from 'issue advocacy.'" Id. at 126. Yet, in Congress's view, those "two categories of advertisements proved functionally identical in important respects. Both were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words." Id. And, far more than a theoretical problem, the collapsed distinction between express advocacy and issue advocacy allowed entities—mostly corporations and unions—to spend "hundreds of millions of dollars" on ads leading up to elections that "were

18

unregulated under FECA." Id. at 127–28. "Moreover, though ostensibly independent of the candidates, the ads were often actually coordinated with, and controlled by, the campaigns." Id. at 131. The Senate Committee on Governmental Affairs conducted "an extensive investigation into the campaign practices in the 1996 federal elections" and—while divided along party lines regarding some of these practices—agreed that the proliferation of so-called issue ads was a serious problem. Id. at 129.

In response, BCRA created a new category of political communications called "electioneering communications." The statute's definition of these communications "replace[d] the narrowing construction of FECA's disclosure provisions adopted by this Court in Buckley" by providing three clear criteria that triggered regulation. Id. at 189. Instead of covering only "communications expressly advocating the election or defeat of particular candidates," the new disclosure requirements covered ads that (1) referenced to a candidate for federal office, (2) ran within 60 days of a federal election, and (3) targeted the relevant electorate. And the Act imposed disclosure requirements on entities who funded those communications. Id. at 190–91.

This legislative history leaves little doubt that Congress saw electioneering communications as generally aimed at swaying voters. The Supreme Court relied heavily on this history in McConnell, where it upheld BCRA's disclosure requirements against First Amendment challenge. 540 U.S. at 189–202 (controlling opinion of Stevens & O'Connor, JJ.). The Court's reasons for doing so further suggest that electioneering communications presumptively have an electioneering purpose. In rejecting the argument that BCRA's definition of "electioneering communications" was unconstitutionally vague and overbroad, the Court explained that Buckley's distinction between express and issue advocacy "was the product of statutory interpretation rather than a constitutional command." Id. at 192. In the Court's view,

19

BCRA's definition of electioneering communications created no similar issues of vagueness or overbreadth—its requirements were "easily understood and objectively determinable." Id. at 194. Moreover, putting aside Buckley and starting from first principles, the Court explained that the notion of "a rigid barrier between express advocacy and so-called issue advocacy" could not be "squared with [its] longstanding recognition that the presence or absence of magic words [*i.e.*, "vote for Jane Doe" or "vote Jane Doe out of office"] cannot meaningfully distinguish electioneering speech from a true issue ad." Id. at 193. As evidenced by their timing, their identification of a specific candidate, and their targeting of the relevant electorate, it was clear that electioneering communications—magic words or not—"were specifically intended to affect election results." Id. at 127. In short, the Supreme Court's reading of BCRA corroborates that Congress deemed electioneering communications as paradigmatically aimed at swaying voters.[13]

Even ignoring all of this legislative history and Supreme Court analysis, Congress's intent regarding these ads is manifest in its very choice of labelling them "electioneering communications." Instead of using a neutral term like "communications made near federal elections," Congress chose a label that by its plain meaning deems the ads to "take part actively and energetically in a campaign to be elected to public office." Electioneer, Oxford Dictionary of English 565 (3d ed. 2010); see also Electioneer, American Heritage Dictionary (5th ed. 2018) ("To work actively for a candidate or political party."). Congress's terms, like its statutory

---

[13] While McConnell was a fractured decision, a majority of the Justices voted to uphold the disclosure requirements for the reasons stated in the controlling opinion written by Justices Stevens and O'Connor. See 540 U.S. at 201 (opinion of Stevens & O'Connor, J.J., joined by Souter, Ginsburg & Breyer, J.J.); see also id. at 286 n.*, 321 (opinion of Kennedy, J., joined by Rehnquist, C.J., and Scalia, J.) (voting to uphold the relevant disclosure provisions). And all but one of the Justices in Citizens United relied on the same rationale in rejecting a challenge to BCRA's electioneering-related disclosure requirements as applied to certain political ads. 558 U.S. at 368–69; id. at 396 (Stevens, J., concurring in part and dissenting in part).

20

headings, surely "supply clues" about its intent. <u>Yates v. United States</u>, 135 S. Ct. 1074, 1083 (2015); <u>see also, e.g.</u>, <u>Trainmen v. Baltimore & Ohio R.R. Co.</u>, 331 U.S. 519, 528–29 (1947) (explaining that "the title of a statute and the heading of a section" are "tools available for the resolution of a doubt"). Here, the clue is hardly subtle: Why would Congress call something an "electioneering communication" if that thing did not generally have a "purpose to nominate or elect a candidate," in the sense meant by <u>Buckley</u>?

It is true that BCRA did not touch the text of FECA's definition of "political committee." But a later congressional act can inform the meaning of an earlier one and, importantly here, can clarify existing ambiguities. "At the time a statute is enacted, it may have a range of plausible meanings," but "subsequent acts can shape or focus those meanings. . . . This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 143 (2000); <u>see also</u> <u>United States v. Estate of Romani</u>, 523 U.S. 517, 530–31 (1998) ("[A] specific policy embodied in a later federal statute should control our construction of the priority statute, even though it had not been expressly amended."). Here, by declaring that (by and large) electioneering communications have an inherent purpose of influencing a federal election, Congress has clarified that the broad term "political committee"—even after <u>Buckley</u>—should presumptively include organizations that are primarily in the business of funding electioneering communications.

Why only "presumptively"? Despite the foregoing evidence of Congress's intent regarding electioneering ads, the Court is not convinced that Congress intended to *categorically* foreclose the Commission from declining to treat a particular electioneering ad as supporting an election-related major purpose. In rejecting a facial challenge to BCRA's electioneering

21

restrictions, <u>McConnell</u> recognized that some ads falling within BCRA's definition of "electioneering advertisements" may not have a true "electioneering purpose," even if "the vast majority of ads clearly had such a purpose." 540 U.S. at 206 ("The precise percentage of issue ads that clearly identified a candidate and were aired during those relatively brief preelection timespans but had no electioneering purpose is a matter of dispute between the parties and among the judges on the District Court [below].").

In other words, Congress seems to have left open a small interpretive gap after BCRA: one that allows the Commission, using its case-by-case approach, to deem an extraordinary "electioneering communication" as lacking an election-related purpose. The following ad, for example, would seem to fall within the letter of BCRA's definition: It runs 60 days before a midterm election; it does not mention the election or even indirectly reference it (*e.g.*, by cabining the message's timeframe to "this November"); the meat of the ad discusses the substance of a proposed bill; the ad urges the viewer to call a named incumbent representative and request that she vote for the bill; but it does not make any reference to the incumbent's prior voting history or otherwise criticize her. <u>See</u> 52 U.S.C. § 30104(f)(3)(A). That might be the sort of electioneering communication that could, under the Commission's case-by-case approach, properly be deemed lacking an election-related purpose under <u>Buckley</u> despite meeting BCRA's definition of "electioneering communication."

But the Court expects such an ad to be a rare exception. Congress has made a judgment that run-of-the-mill electioneering communications have the purpose of influencing an election;

22

an ad meeting the statutory definition of an electioneering communication generally indicates a purpose of nominating or electing a candidate.

## B. The Commission's Analysis Did Not Give Effect to Congress's Clear Intent

The controlling Commissioners' multifactor analysis ignores Congress's expressed intent regarding electioneering advertisements. The very first sentence of their multifactor test speaks volumes: "In evaluating major purpose, our starting point is the language of the communication itself." J.A. 1767. Starting with the language of a political ad might be justifiable if the ad aired nowhere near a federal election, or if it did not mention a candidate. But, as just explained, when it comes to electioneering communications Congress has already determined that they are presumptively designed to influence elections. The remainder of the Commission's test in no way accounts for that fact:

> [W]e look at the ad's specific language for references to candidacies, elections, voting, political parties, or other indicia that the costs of the ad should be counted towards a determination that the organization's major purpose is to nominate or elect candidates. We also examine the extent to which the ad focuses on issues important to the group or merely on the candidates referenced in the ad. Additionally, we consider information beyond the content of the ad only to the extent necessary to provide context to understand better the message being conveyed. Finally, we ascertain whether the communication contains a call to action and, if so, whether the call relates to the speaker's issue agenda or, rather, to the election or defeat of federal candidates.

J.A. 1767–68. The Commission may be permitted to use these or similar factors in assessing whether an electioneering ad *overcomes* the presumption that it is aimed to elect a candidate. But engaging in a holistic, *de novo* review of the ad based on those factors allows the Commission to treat run-of-the-mill electioneering ads—those highly critical of a candidate's positions but lacking the "magic words" directing viewers to vote him out of office—as not

23

indicating an electioneering purpose. That framework cannot be squared with Congress's views on the issue.

Indeed, the controlling Commissioners' analysis of AAN's ads in this case is strong evidence that their multifactor approach, if anything, builds in a presumption that runs in the *opposite* direction of what Congress intended—*i.e.*, that it tilts the balance in favor of finding that electioneering communications do *not* have an electioneering purpose. Take the ad titled "Skype," which identified Congresswoman Dina Titus, a Democrat from Nevada who was narrowly defeated in her 2010 reelection bid:

> Person l: Hey, what's up?
>
> Person 2: Hey. You have to check out the article I just sent you. Apparently convicted rapists can get Viagra paid for by the new health care bill.
>
> Person 1: Are you serious?
>
> Person 2: Yep. I mean, Viagra for rapists? With my tax dollars? And Congresswoman Titus voted for it.
>
> Person 1: Titus voted for it?
>
> Person 2: Yep. I mean, what is going on in Washington?
>
> Person 1: In November, we need to tell Titus to repeal it. [Superimposed text: "Tell Congresswoman Titus to vote for repeal in November. Vote Yes on H.R. 4903. (202) 225-3252."]

J.A. 1776.

The controlling Commissioners did not find that this ad (nor any others mentioning healthcare) had an election-related purpose. "The criticisms contained in the ads," they explained, "are couched in terms of past votes taken by the named officeholder and are accompanied by calls to action designed to influence the officeholders' votes in the lame-duck session." J.A. 1776. Seriously? Is it really plausible that the attack on Titus's past vote for the

24

Affordable Care Act—for supplying "Viagra to rapists" no less—was designed to mobilize Titus's constituents to change her view on the Obama Administration's signature legislative initiative, rather than to oust her from office for casting that vote? And would a sophisticated organization like AAN conceivably invest millions of dollars on ads in an effort to get the Democratic-controlled House that had just passed the Act to turn around and repeal it only months later? Perhaps the ad could be charitably read as having a dual purpose—maybe some viewers would indeed be motivated to call Titus and tell her to vote for a healthcare repeal bill if it came up in the anticipated lame-duck session. (That turned out to be a big "if"—the Commission cites no evidence, and the Court is aware of none, that the House actually considered a repeal bill during the December lame-duck session.) But surely the primary purpose of this ad was to convince viewers to vote against Titus. Indeed, the ad is awfully close to the hypothetical posed by the Supreme Court in McConnell to highlight the illusory distinction between express advocacy and issue advocacy: An ad that, instead of urging viewers to "vote against Jane Doe," "condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'" 540 U.S. at 127 (quoting 251 F. Supp. 2d 176, 304 (D.D.C. 2003) (Henderson, J., concurring in the judgment in part and dissenting in part)). That the Commissioners readily characterized "Skype" and similar ads as unrelated to elections demonstrates the mismatch between their framework and Congress's understanding of electioneering ads. Their approach in fact flirts with a *reverse* "magic words" test: electioneering communications that harangue a candidate are exempt so long as they instruct the viewer to "call" her representative rather than to "vote against" him.

  None of the Commission's arguments in favor of its approach are availing. As it did when justifying its first dismissal, the Commission cites WRTL II, which (again) found that

*spending* on electioneering communications could be restricted only if the ads were, as an objective matter, "the functional equivalent of express advocacy," id. at 469. Relying on that case, the Commission insists that even if it may not apply a categorical rule that turns on whether the ad contains express advocacy (or the functional equivalent), it may *consider* whether the ad resembles express advocacy in deciding whether it has an election-related purpose. FEC's Mot. Summ. J. at 40 ("[The Court's] determination did not preclude Commissioners from analyzing AAN's communications by reference to their content, consistent with the Supreme Court's analysis in WRTL, when considering whether the ads were electoral in nature."). That's true so far as it goes: the Commission is not outright forbidden from considering the content of an electioneering communication. But because of BCRA, that consideration must follow a strong presumption that an electioneering communication indicates a purpose of electing a candidate.

More fundamentally, the Commission continues to overread WRTL II for the idea that the primary goal in evaluating AAN's ads should be to determine whether the ads' *content* bears "indicia of express advocacy." FEC's Mot. Summ. J. at 39 (quoting WRTL II, 551 U.S. at 470). WRTL II focused narrowly on an electioneering communication's content, to the exclusion of "contextual factors" like the ad's timing, for a particular reason: the First Amendment demanded an objective, narrowly tailored standard for *bans* on speech. 551 U.S. at 473; see id. at 469–70 (examining whether ad's content had "indicia of express advocacy"). But, again, McConnell and Citizens United v. FEC—the latter of which came after WRTL II—foreclose any argument that *in the disclosure setting* the First Amendment requires that a regulated communication contain the functional equivalent of express advocacy. See also Independence Institute v. FEC, 216 F. Supp. 3d 176, 193 (D.D.C. 2016) (Millett, J.) (in rejecting a constitutional challenge to the donor disclosure requirement as applied to a particular electioneering communication, explaining that

26

the challenger's "proposed constitutional exception for 'genuine' issue advocacy is entirely unworkable as a constitutional rule"). In other words, the Supreme Court has seen no problem with disclosure requirements triggered solely by an electioneering communication's context: its timing, its reference to a candidate, and its viewership. And Congress's view, made plain in BCRA, is that the presence of those contextual factors inherently suggests an election-related purpose.

The Commission falls back on Buckley. In the Commission's view, the fact that Buckley read FECA to avoid regulating "groups engaged purely in issue discussion," 424 U.S. at 79, means that the Commission must evaluate the content of an entity's political ads to determine whether the ads are, in fact, "issue discussion." But again, Congress in BCRA cabined some of the Commission's discretion by defining a subset of political ads—electioneering communications—that by definition are related to federal elections. After BCRA, the Commission cannot review electioneering communications *de novo* to determine whether they qualify as pure issue discussion. The statute emphatically placed electioneering advertisements on the election-related side of Buckley's line, and the Commission must pay heed to that placement when evaluating the major purpose of an entity that spends money on electioneering communications.

Finally, the Commission emphasizes this Court's prior refusal to impose a bright-line rule—one that would require it to count all electioneering communications toward an election-related major purpose. According to the Commission, that refusal implicitly endorsed its approach to electioneering communications. FEC's Mot. Summ. J. at 36. Not so. To be sure, the Court continues to believe that an inflexible rule would be incompatible with the FEC's recognized power to resolve major-purpose questions on a case-by-case basis. Such a rule would

27

also conflict with the Supreme Court's recognition in <u>McConnell</u> that some "issue ads" might really be just that, even if run near elections. That does not mean, though, that the Commission has unfettered discretion to judge electioneering ads. Rather, FECA and BCRA make clear that Congress intended to foreclose the Commission from applying a major-purpose framework that does not, at a minimum, presumptively consider spending on electioneering ads as indicating an election-related major purpose.[14] The Commission may in special circumstances conclude that an electioneering ad does not have such a purpose. But given Congress's recognition that the "vast majority" of electioneering ads have the purpose of electing a candidate, the Commission's exclusion of electioneering ads from its major-purpose analysis should be the rare exception, not the rule. <u>McConnell</u>, 540 U.S. at 206; <u>see also</u> <u>CREW</u>, 209 F. Supp. 3d at 93 ("[I]t blinks reality to conclude that many of the ads considered by the Commissioners in this case were not designed to influence the election or defeat of a particular candidate in an ongoing race.").

Having found a legal error in the Commissioners' approach, the appropriate remedy here is to remand this matter to the Commission. The Court appreciates that the Commission may, on remand, yet again exclude from its analysis some of the ads that it previously excluded. But because the controlling Commissioners did not begin with a presumption that an electioneering ad evinces an election-related purpose, the Court is not so confident that they would reach the

---

[14] This is not to say that spending on advertisements is the sole relevant factor in determining an entity's major purpose. The point here is that to the extent that spending on advertising *is* relevant—and surely it is to some degree—the Commission must account for spending in a way that reflects an electioneering ad's presumptive purpose of affecting an upcoming election.

same outcome on remand to warrant affirming their decision under the principle of "harmless error."[15]

## IV.    Conclusion

The Court recognizes that the Commission, like all executive agencies, must comply with directives from the two other branches of government—directives that sometimes push the agency in opposite directions.  The problem here is that the FEC has equated two directives that are plainly unequal in their relevance to the issue at hand.  Congress decades ago laid down a clear, broad definition of the term "political committee" in FECA that would obviously capture AAN;  the Supreme Court in Buckley then cabined that definition in a way that requires the Commission to conduct a major purpose analysis.  But Congress later clarified, through BCRA, that it viewed the vast majority of electioneering communications as corroborating a purpose of electing candidates to federal office.  And while the Supreme Court in several cases has struck down *other* aspects of FECA and BCRA, it has never suggested that its constitutional concerns apply in the realm of disclosure requirements.  Indeed, the Supreme Court has now twice reaffirmed that there is no constitutional distinction between issue-based and express advocacy in the disclosure context.  Absent such a distinction, FECA and BCRA require the agency to presume that spending on electioneering communications contributes to a "major purpose" of

---

[15] Because the Administrative Procedure Act instructs courts to take "due account . . . of the rule of prejudicial error," 5 U.S.C. § 706, courts reviewing agency action under that Act will not remand to the agency if "the agency's mistake did not affect the outcome."  PDK Labs., Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004).  Though FECA contains no express requirement of prejudice, courts have invoked the principle in reviewing an FEC decision.  See, e.g., Level the Playing Field v. FEC, 232 F. Supp. 3d 130, 142–43 (D.D.C. 2017).  The Court therefore assumes that, in theory, a harmless legal error would not require remanding this case to the Commission.

nominating or electing a candidate for federal office, and, in turn, to presume that such spending supports designating an entity as a "political committee" under FECA.

Because the Commission failed to apply those presumptions, its dismissal of CREW's complaints against AAN was "contrary to law." The Court, accordingly, will grant CREW's motion for summary judgment, deny the FEC's and AAN's cross-motions, and direct the Commission to conform with this declaration within 30 days. 52 U.S.C. § 30109(a)(8)(C). If the FEC does not timely conform with the Court's declaration, CREW may bring "a civil action to remedy the violation involved in the original complaint." Id. A separate Order accompanies this Memorandum Opinion.

Christopher R. Cooper
_____
CHRISTOPHER R. COOPER
United States District Judge

Date: March 20, 2018

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**CITIZENS FOR RESPONSIBILITY AND**
**ETHICS IN WASHINGTON,** *et al.*,

         Plaintiffs,

         v.                        Case No. 16-cv-2255 (CRC)

**FEDERAL ELECTION COMMISSION,**

         Defendant,

**AMERICAN ACTION NETWORK, INC.,**

         Intervenor Defendant.

---

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that:

1. Defendant Federal Election Commission's Motion for Summary Judgment (ECF No. 28) is DENIED.

2. Intervenor-Defendant American Action Network's Motion for Summary Judgment (ECF No. 30) is DENIED.

3. Plaintiffs' Cross-Motion for Summary Judgment (ECF Nos. 31 & 32) is GRANTED.

4. Defendant Federal Election Commission shall conform with the Court's declaration within 30 days, in accordance with 52 U.S.C. § 30109.

      **SO ORDERED.**

                                 *Christopher R. Cooper*
                                _____
                                 CHRISTOPHER R. COOPER
                                 United States District Judge

Date: <u>March 20, 2018</u>